JACOBS, Circuit Judge.
Creditors Deutsche Bank AG (London Branch) and Bear, Stearns & Co., Inc. (collectively, “appellants”) challenge the now-largely implemented Plan of Reorganization (“Plan”) confirmed in the Chapter 11 bankruptcy proceeding of Metromedia Fiber Network, Inc. and its subsidiaries (collectively, “Metromedia”). This appeal is taken from a March 18, 2004 judgment of the United States District Court for the Southern District of New York (Brieant, /.), affirming the August 21, 2003 confirmation order of the Bankruptcy Court (Hardin, Jr., B.J.).
First, appellants challenge the reallocation to other creditors of stock warrants that were initially allocated to appellants under Metromedia’s Plan. Without contesting that cash and stock allocated to appellants were properly reallocated to those creditors under the terms of a prior subordination agreement, appellants argue that they are allowed to keep the warrants by virtue of an exception in that subordination agreement, a so-called “X-Clause.”
Second, appellants argue that releases in the Plan improperly shield certain non-debtors from suit by the creditors.
AboveNet, Inc., Hk/a Metromedia Fiber Network, Inc., and its subsidiaries (collectively, “appellees” or “the Reorganized Debtors”) refute these claims on the merits, and also argue that this appeal should be deemed equitably moot because numerous transactions have occurred since the Plan’s September 8, 2003 effective date, and because appellants failed to ask the bankruptcy court or the district court for a stay of confirmation pending this appeal.
*139 Appellants’ objections to the Plan were rejected on the merits by the bankruptcy court and the district court. At the same time, the district court ruled that relief (if justified by the merits) would not have been barred by the doctrine of equitable mootness because effective relief could have been afforded without “unraveling the Plan.”
This Court exercises plenary review over the decisions of the district court and bankruptcy court; we review conclusions of law de novo and findings of fact for clear error. Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.), 377 F.3d 209, 212 (2d Cir.2004). We conclude that the reallocation of the warrants was proper, but that the bankruptcy court erred in approving the nondebtor releases. Nevertheless, we affirm because this appeal is equitably moot.
I. The X-Clause
Before the bankruptcy, appellants purchased various Metromedia notes (the “Notes”) governed by an indenture agreement that subordinated the rights of the note holders to those of other creditors (“the Senior Indebtedness”) as follows:
Upon the payment or distribution of the assets of [MFN[1]] of any kind or character ... to creditors upon any dissolution, winding-up, liquidation or reorganization of [MFN] ... any payment or distribution of assets of [MFN] of any kind or character ... to which the Holders [of the Notes] or the Trustee on behalf of the Holders would be entitled ... shall be paid or delivered ... to the holders of the Senior Indebtedness .... securities of [MFN] as reorganized or readjusted, or securities of [MFN] or any other Person provided for by a plan of reorganization or readjustment, junior, or the payment of which is otherwise subordinate, at least to the extent provided in this Article 12, with respect to the Notes, to the payment of all Senior Indebtedness.
However, a so-called X-Clause exempted from subordination:
The Notes were outstanding when Me-tromedia filed for relief under Chapter 11. The Plan provided in relevant (small) part that [i] on account of the Notes, appellants were to be paid a combination of cash, common stock in the Reorganized Debtors, and five- and seven-year warrants to purchase additional common stock at specified prices; but [ii] under the terms of the subordination agreement described above, appellants’ entire distribution would be reallocated to the Senior Indebtedness.
Appellants concede that the Plan properly reallocated the cash and stock to the Senior Indebtedness; but they argue that the X-Clause allowed them to keep the stock warrants.
The stock warrants are covered by the X-Clause if they are “junior,” or if their “payment ... is otherwise subordinate ... with respect to the Notes, to the payment of all Senior Indebtedness.” But the text is not self-reading; the applicability of the clause in a specific case is not readily apparent; and the parties have submitted no evidence as to the drafters’ intentions. Still, such clauses seem to be common in the industry. See In re Envirodyne Indus., 29 F.3d 301, 306 (7th Cir.1994).
Helpful guidance is found in the American Bar Foundation’s Commentaries on Model Debenture Indenture Provisions (1971) [hereinafter Commentaries ].[2] In a *140 nutshell, when subordinated and senior note holders are given securities under a plan of reorganization, an X-Clause allows the subordinated note holder to retain its securities only if the securities given to the senior note holder have higher priority to future distributions and dividends (up to the full amount of the senior notes). This provides for full payment of the senior notes before any payment of the subordinated notes is made. In such a case, the senior note holder enjoys unimpaired the priority to payment that it had under its notes, ie., payments on the subordinated note holder’s securities are “subordinate ... to the payment of all Senior Indebtedness.” See Commentaries, supra, § 14-5, at 570 (X-Clause is triggered where “mortgage bonds, preferred stock or similar higher class security” are provided to senior note holders and “common stock” is provided to subordinated note holders because “this kind of distribution gives practical effect to the subordination and therefore turnover is not required”)[3]; Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture, Revised Model Simplified Indenture, 55 Bus. Law. 1115, 1221 (2000) (“If Senior Debt were to receive preferred stock and the subordinated debt were to receive common stock, for example, where the preferred stock precluded distributions to common stockholders until the preferred stock was redeemed, the X-Clause would permit that distribution.”). This approach assures that the junior creditor remains fully subordinated without requiring it to yield assets that are not required for full payment of the senior creditor and that would therefore make a round-trip to the senior creditor and back, with the attendant delay, friction, and transaction cost.
The caselaw on X-Clauses is consistent with this approach. The Seventh Circuit considered an X-Clause virtually identical to the X-Clause in this case, and construed it to exempt from subordination securities allocated to junior creditors that “are subordinated to the claims of the senior creditors,” and which therefore do not “erase the priority” of the senior class. Envirodyne, 29 F.3d at 303, 306; see also In re PWS Holding Corp., 228 F.3d 224, 244-45 (3d Cir.2000) (X-Clause allows securities to be retained if they “are subordinated to the same extent as the existing subordinated debt” (quotation omitted)).
The question thus presented is whether appellants can keep the stock warrants without impairing the priority assured to the Senior Indebtedness by the subordination agreement. The answer is no. Under the Plan, the Senior Indebtedness received cash, common stock, and warrants identical to those at issue here. It is undisputed that the Senior Indebtedness did not receive full payment for its debt under the Plan. If appellants can keep their warrants, they would be able to buy the same class of common stock allocated to the Senior Indebtedness, giving appellants and the Senior Indebtedness equal *141 priority to any future distribution. Therefore, allowing appellants to retain the warrants would effect an impairment of seniority.
II. The Nondebtor Releases
Among the claims settled in the Plan are those of the Kluge Trust.[4] Under the Plan, the Kluge Trust would [i] forgive approximately $150 million in unsecured claims against Metromedia; [ii] convert $15.7 million in senior secured claims to equity in the Reorganized Debtors; [iii] invest approximately $12.1 million in the Reorganized Debtors; and [iv] purchase up to $25 million of unsold common stock in the Reorganized Debtors’ planned stock offering (collectively, “Kluge Consideration”). In return, the Kluge Trust would receive [i] 10.8% of the Reorganized Debtors’ common stock and [ii] the “Kluge Comprehensive Release,” which provides that
the Kluge Trust and each of the Kluge Insiders shall receive a full and complete release, waiver and discharge from ... any holder of a claim of any nature ... of any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with any matter related to [Metromedia] or one or more subsidiaries ... based in whole or in part upon any act or omission or transaction taking place on or before the Effective Date.
Appellants challenge this release, as well as two other releases that permanently enjoin creditors from suing various non-debtors.[5] Appellants’ sole argument — and the only argument that we consider — is that these nondebtor releases were unauthorized by the Bankruptcy Code, 11 U.S.C. § 101 et seq., at least on the findings made by the bankruptcy court.
We have previously held that “[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor’s reorganization plan.” SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir.1992). While none of our cases explains when a nondebtor release is “important” to a debt- or’s plan, it is clear that such a release is proper only in rare cases. See, e.g., Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 657-58 (6th Cir.2002) (“[S]uch an injunction is a dramatic measure to be used cautiously .... ”); Gillman v. Cont’l Airlines (In re Cont’l Airlines), 203 F.3d 203, 212-13 (3d Cir.2000) (recognizing that non-debtor releases have been approved only in “extraordinary cases”). The Ninth and Tenth Circuits have held that nondebtor releases are prohibited by the Code, except in the asbestos context. See Resorts Int’l, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401-02, 1402 n. 6 (9th Cir.1995); Landsing Diversified Props.-II v. First Nat’l Bank and Trust Co. of Tulsa (In re W. Real Estate Fund, Inc.), 922 F.2d 592, 600-02 (10th Cir.1990) {per curiam).
*142 At least two considerations justify the reluctance to approve nondebtor releases. First, the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims. Cont'l Airlines, 203 F.3d at 211 & n. 6; see also Dow Corning, 280 F.3d at 656 (“The Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor’s claims against a non-debtor to facilitate a reorganization plan.”). True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to “issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]”; but section 105(a) does not allow the bankruptcy court “to create substantive rights that are otherwise unavailable under applicable law.” New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.), 351 F.3d 86, 92 (2d Cir.2003) (quotations and citation omitted). Any “power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code.” Douglas G. Baird, Elements of Bankruptcy 6 (3d ed.2001); accord Dairy Mart, 351 F.3d at 92 (“Because no provision of the Bankruptcy Code may be successfully invoked in this case, section 105(a) affords [appellant] no independent relief.”).
Second, a nondebtor release is a device that lends itself to abuse. By it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity. Here, the releases protect against any claims relating to the debtor, “whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured.”[6]
Courts have approved nondebtor releases when: the estate received substantial consideration, e.g., Drexel Burnham, 960 F.2d at 293; the enjoined claims were “channeled” to a settlement fund rather than extinguished, MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir.1988); Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 701 (4th Cir.1989); the enjoined claims would indirectly impact the debtor’s reorganization “by way of indemnity or contribution,” id.; and the plan otherwise provided for the full payment of the enjoined claims, id. Nondebtor releases may also be tolerated if the affected creditors consent. See In re Specialty Equip. Cos., 3 F.3d 1043, 1047 (7th Cir.1993).
But this is not a matter of factors and prongs. No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique. See Dow Corning, 280 F.3d at 658; accord Cont'l Airlines, 203 F.3d at 212-13 (“A central focus of these ... reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.”); see also, e.g., Drexel Burnham, 960 F.2d at 288-93 (approving multi-billion *143 dollar settlement of 850 securities claims against Drexel, involving $1.3 billion payment into fund by Michael Milken and other eo-liable Drexel personnel).
Here, the sole finding made to justify the Kluge Comprehensive Release is that the Kluge Trust made a “material contribution” to the estate. But there is no finding (or evidence presented) that the Kluge Comprehensive Release was itself important to the Plan[7] — which is what Drexel Burnham at minimum requires. See 960 F.2d at 293 (question is whether “the injunction plays an important part in the debtor’s reorganization plan”). Nor was any inquiry made into whether the breadth of the Kluge Comprehensive Release — which covers numerous third parties in addition to the Kluge Trust, and which covers any and all claims relating to Metromedia — was necessary to the Plan. (The two other releases were not separately considered.)
The bankruptcy court’s findings were insufficient. A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan, focusing on the considerations discussed above, see supra at 142-143. Cf. Dow Corning, 280 F.3d at 658 (requiring bankruptcy court to make “specific factual findings that support its conclusions” before authorizing nondebtor releases).
Appellants also claim that notwithstanding any other limitation on nondebtor releases, good and sufficient consideration must be paid to any enjoined creditor. Such consideration has weight in equity, but it is not required. In Drexel Bum-ham, the complaining creditors received none of the proceeds of the settlement with Drexel’s personnel. 960 F.2d at 289, 293.
By the same token, we reject appellees’ argument that because appellants were allocated a Plan distribution, they received consideration, and therefore cannot be heard to complain about the non-debtor releases. Appellants’ Plan distribution (ultimately re-distributed to other creditors, see supra, at 139), was on account of appellants’ Notes, not on account of their claims against any nondebtor. See Cont’l Airlines, 203 F.3d at 215 & n. 13 (differentiating between plan distribution and consideration for enjoined claims). In any event, a nondebtor release is not adequately supported by consideration simply because the nondebtor contributed something to the reorganization and the enjoined creditor took something out.
III. Equitable Mootness
Insufficient findings would ordinarily be remedied by remand to the bankruptcy court. However, appellees argue that this appeal should be dismissed because it is equitably moot. We agree. This court has held that in bankruptcy cases, “[a]n appeal should ... be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.” Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325 (2d Cir.1993) [hereinafter Chateaugay I ].
Equitable mootness is a doctrine distinct from constitutional mootness, though they have been discussed in the *144 same breath. See, e.g., id. Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented. See, e.g., In re UNR Indus., 20 F.3d 766, 769 (7th Cir.1994) (“There is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome (‘equitable mootness’).”); see also MAC Panel Co. v. Va. Panel Corp., 283 F.3d 622, 625 (4th Cir.2002) (“[EJquitable mootness is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable.” (emphasis omitted)); In re Envirodyne Indus., 29 F.3d 301, 304 (7th Cir.1994) (defining the doctrine as “merely an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties”).
Because equitable mootness bears only upon the proper remedy, and does not raise a threshold question of our power to rule, a court is not inhibited from considering the merits before considering equitable mootness. See, e.g., id. at 303-04. Often, an appraisal of the merits is essential to the framing of an equitable remedy.
As to the merits of the mootness argument, a plan is “substantially consummated” upon [i] transfer of substantially all of the property proposed by the plan to be transferred; [ii] the reorganized debtor’s assumption of the debtor’s business; and [in] commencement of distribution under the plan. 11 U.S.C. § 1101(2). In that context, appellees cite the transactions completed since the Plan’s September 8, 2003 effective date, including the issuance of substantially all of the Reorganized Debtors’ stock (AboveNet, Inc., now publicly traded on NASDAQ), the full receipt of the Kluge Consideration, the cash distributions, and entry into a host of contracts, leases, and other arrangements as part of AboveNet’s day-to-day operations. We conclude that Metromedia’s Plan has been “substantially consummated” as that term is defined by the Code. Appellants have not argued otherwise on appeal.
“[T]he ability to achieve finality is essential to the fashioning of effective remedies.” Chateaugay I, 988 F.2d at 325. When a plan has been substantially consummated, an appeal should be dismissed unless several enumerated requirements are satisfied. See Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952-53 (2d Cir.1993) [hereinafter Chateaugay II ]; see also UNR Indus., 20 F.3d at 769 (“In common with other courts of appeals, we have recognized that a plan of reorganization, once implemented, should be disturbed only for compelling reasons.”). A chief consideration under Chateaugay II is whether the appellant sought a stay of confirmation. If a stay was sought, we will provide relief if it is at all feasible, that is, unless relief would “knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court.” Chateaugay II, 10 F.3d at 953 (quotation omitted). But if the appellant failed to seek a stay, we consider additionally whether that the failure renders relief inequitable. Id. We insist that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one. See Chateaugay I, 988 F.2d at 326 (“A party cannot escape the obligation to protect its litigation position by so facile an argument.”).
Here, appellants sought no stay of the confirmation order, and sought no expedited review in this appeal, which was filed over a year ago. Never mind, appellants argue, because (as the district court *145 found) we can provide effective relief without “unraveling the Plan.” Specifically, appellants may be permitted in all equity to pursue any claim barred by the releases. We disagree. In the absence of any request for a stay, the question is not solely whether we can provide relief without unraveling the Plan, but also whether we should provide such relief in light of fairness concerns. See Chateaugay II, 10 F.3d at 952-53; Chateaugay I, 988 F.2d at 325.
Even if we could carve out appellants’ claims from the nondebtor releases, we would not do so. If appellants’ claims are substantial (as they urge), it is as likely as not that the bargain struck by the debtor and the released parties might have been different without the releases. See, e.g., MAC Panel, 283 F.3d at 626 (declining to vacate injunction and subject non-debtor to lawsuit it paid to avoid); In re Specialty Equip. Cos., 3 F.3d 1043, 1049 (7th Cir.1993) (refusing to nullify nondebt- or releases because such a remedy “would amount to imposing a different plan of reorganization on the parties”); Halliburton Serv. v. Crystal Oil Co. (In re Crystal Oil Co.), 854 F.2d 79, 81 (5th Cir.1988) (“We decline to deprive Bankers Trust of the benefits it bargained for without giving Bankers Trust a chance to reevaluate the concessions it made to get them.”). We therefore would not grant relief in any event without vacatur and remand for further findings and proceedings.
Vacatur and remand would, however, unsettle the settlement of the Kluge Trust’s claims, a critical component of the Plan: in exchange for the Kluge Comprehensive Release and a 10.8% stake in the Reorganized Debtors, the Kluge Trust forgave about $150 million of unsecured claims, converted to equity another $15 million, invested a further $12.1 million in the Reorganized Debtors, and committed itself to purchase up to $25 million of unsold stock. It appears that all these things have been done, and that none of the completed transactions can be undone without violence to the overall arrangements. In any event, we cannot predict what will happen if this settlement is in any part altered.
Having sought no stay of the bankruptcy court’s order (and no expedited appeal), appellants bear the burden of this uncertainty. See Chateaugay I, 988 F.2d at 326 (“The party who appeals without seeking to avail himself of that protection does so at his own risk.”); see also, e.g., Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 776 (2d Cir.1996) (noting in dicta that we “presume that it will be inequitable or impractical to grant relief after substantial consummation,” unless, among other things, “the entity seeking relief has diligently pursued a stay of execution of the plan throughout the proceedings”); Retired Pilots Assoc. of U.S. Airways, Inc. v. U.S. Airways Group, Inc. (In re U.S. Airways Group Inc.), 369 F.3d 806, 810 (4th Cir.2004) (failure to seek a stay or expedited appeal “weighs strongly in favor of a finding of equitable mootness”); TWA Inc. v. Texaco, Inc. (In re Texaco Inc.), 92 B.R. 38, 46 (S.D.N.Y.1988) (“[T]here fairly exists a strong presumption that appellants’ challenges have been rendered moot due to their inability or unwillingness to seek a stay.” (quotation omitted)).
This appeal is equitably moot.
CONCLUSION
For the foregoing reasons, the judgment of the district court is Affiímed.

. "MFN” refers to Metromedia Fiber Network, Inc.

. We have previously relied on the Commentaries to interpret indenture provisions. See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71-72 (2d Cir.1988); *140 Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048-50 (2d Cir.1982); see also Envirodyne, 29 F.3d at 305 (approving of the use of texts, such as the Commentaries, which “like trade usage, are in the nature of specialized dictionaries”).

. One of the model X-Clauses in the Commentaries closely resembles the X-Clause in this case:
(other than securities of the Company as reorganized or readjusted or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in this Article with respect to the Debentures, to the payment of all indebtedness in the nature of Senior Debt, provided that the rights of the holders of Senior Debt are not altered by such reorganization or readjustment.)
Commentaries, supra, § 14-5, at 571.

. The Kluge Trust is defined by the Plan as a trust between John W. Kluge, "as Grantor, and Stuart Subotnick, Kluge and Chase Manhattan Bank, as Trustees.” The Kluge Insiders are any "insider,” as defined at 11 U.S.C. § 101(31), of Kluge or the "Metromedia Company,” and Kluge, the Metromedia Company, Stuart Subotnick, Silvia Kessel, and David Persing.

. One release bars claims against former or current Metromedia personnel (among others), that are related to Metromedia's bankruptcy and based on acts or omissions taking place on or before the Plan's Effective Date, unless based upon "gross negligence or willful misconduct.” A second (similar) release shields former or current Metromedia personnel from any claim relating to Metromedia, the Reorganized Debtors, or the Plan.

. Each of the releases contains exceptions for certain identified actions not at issue in this appeal.

. AboveNet’s chief operating officer was asked at the confirmation hearing if he knew “what happens with respect to [the Kluge Settlement] in the event the [Kluge Comprehensive Release] is not granted.” He answered, “No, not really.”