In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 07-2212, 07-2430 & 07-2529

IN RE:

AIRADIGM COMMUNICATIONS, INC.,

*Debtor.*

AIRADIGM COMMUNICATIONS, INC.,

*Appellant, Cross-Appellee,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee, Cross-Appellant.*
_____

Appeal from the United States District Court
for the Western District of Wisconsin.
Nos. 07-C-0073-S, 06-C-0747-S—**John C. Shabaz**, *Judge.*
_____

ARGUED NOVEMBER 6, 2007—DECIDED MARCH 12, 2008
_____

Before FLAUM, KANNE, ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Debtor-appellant, Airadigm
Communications, Inc. is a cellular-service provider. In
1996, it successfully bid for fifteen personal communica-
tions services ("PCS") licenses as part of an FCC auction
and opted to pay off the licenses under an installment

plan set up by the FCC. For Airadigm, however, the airwaves were too turbulent, and by 1999 it had filed for chapter-11 bankruptcy. Almost immediately, the FCC cancelled Airadigm's PCS licenses and filed a proof of claim in bankruptcy court for the remaining amounts owed under the installment plan. The ensuing reorganization proceeded under the assumption that the licenses were gone, having been validly cancelled. And although the ultimate reorganization plan set out several contingencies in the event the FCC reinstated the licenses—which it never did—it provided little else regarding the licenses' status after the reorganization. In 2003, the Supreme Court decided *NextWave Personal Communications, Inc. v. FCC*, 537 U.S. 293 (2003), and held that the FCC could not cancel a debtor's PCS licenses just because it had filed for bankruptcy. The FCC conceded a few months later that it had been wrong to terminate Airadigm's licenses and reinstated them as though they had never been cancelled.

Airadigm filed a second chapter-11 petition in May 2006 to tie up the loose ends from the fairly significant legal developments that had come about since its first reorganization. As part of its second filing, Airadigm commenced this adversary proceeding against the FCC, seeking to eliminate the FCC's continuing interest in the licenses based on the 2000 reorganization plan. The bankruptcy court held that the 2000 plan had not affected the FCC's interests in the licenses and subsequently ratified a second plan with the FCC as a partially secured creditor. Both parties appealed—the FCC objected to its treatment under the plan; Airadigm objected to the FCC's continuing interests in the licenses. The district court affirmed the bankruptcy court in all relevant respects, and, for the reasons set out below, so do we.

## I. Background

Section 309(j) of the Communications Act of 1934, as amended in 1993, authorizes the FCC to award licenses to use the electromagnetic spectrum "through a system of competitive bidding," that is, an auction. 47 U.S.C. § 309(j)(1) (2006). Congress recognized that an auction had several advantages over the available alternatives, such as the "development and rapid deployment of new technologies," 47 U.S.C. § 309(j)(3)(A) (2006), and the "recovery for the public . . . a portion of the value of the public spectrum resource," 47 U.S.C. § 309(j)(3)(C). Despite these benefits, a market-based design could concentrate ownership of licenses in the hands of those relatively few businesses that could afford the up-front cost. As a result, the Communications Act directs the FCC to structure the auction to "avoid the excessive concentration of licenses," 47 U.S.C. § 309(j)(3)(B), specifically by "consider[ing] alternative payment schedules . . ., including . . . guaranteed installment payments." 47 U.S.C. § 309(j)(4).

Against this legislative backdrop, the FCC adopted rules to auction off portions of the spectrum used for personal communications services ("PCS"), that segment used for a number of forms of wireless communication. *In re Implementation of Section 309(j) of the Communications Act*, 9 F.C.C.R. 5532 (1994). The FCC specified two of the six frequency blocks being auctioned—Blocks C and F—for smaller businesses who, being unable to afford the lump sum, could pay for their licenses in installments. 47 C.F.R. § 24.709 (2007). To ensure payment, the FCC made payment-in-full a condition precedent to obtaining a license, 47 C.F.R. § 1.2110(g)(4)(iv), and executed a promissory note and security agreement to secure its interest in

each license, *id.* § 1.2110(g)(3). If the successful bidder fell into default, "its license [would] automatically cancel, and it [would] be subject to debt collection procedures." *Id.*

In 1996, the FCC conducted the auction. Airadigm was the highest bidder for fifteen licenses—thirteen of which were "C-block" and two of which "F-block" segments covering Michigan, Iowa, and Wisconsin—and agreed to pay off what it had bid in quarterly installments, plus interest, over a ten-year period. Airadigm paid 10% of the purchase price, signed fifteen promissory notes recognizing its debt to the FCC, and executed fifteen security agreements. The licenses themselves stated that they were conditioned on the "full and timely payment of all monies due pursuant to [FCC regulations] and the terms of the Commission's installment plan." The FCC then sought to perfect its interests in the licenses by, among other things, filing UCC financing statements with the office of the Wisconsin Secretary of State.

Airadigm soon met financial problems and could not meet its obligations to the FCC. In 1999, it filed a petition for reorganization in the Western District of Wisconsin. The FCC allowed Airadigm to continue using its portion of the spectrum but cancelled Airadigm's licenses and filed a proof of claim in the bankruptcy court for $64.2 million, Airadigm's remaining balance. In its proof of claim, the FCC stated that, because it had cancelled the licenses, it was an unsecured creditor. Hedging a bit, the FCC also said that if it did not actually have the authority to cancel the licenses, its debt was instead secured by the licenses themselves, attaching proof of its security interests to its claim. The FCC otherwise participated in Airadigm's bankruptcy, filing a notice of appearance and ultimately objecting to its treatment as an unsecured creditor under the plan.

The 2000 reorganization proceeded under the assumption that the FCC had properly cancelled the licenses. The plan provided that the FCC had an allowed claim of $64.2 million and laid out several contingencies should the FCC reinstate the licenses. The reorganization hinged on financing by a third party, Telephone and Data Systems ("TDS"). Should the FCC reinstate the licenses by February 2001, TDS would pay the FCC's claim in full. If the FCC did not reinstate the licenses by February 2001, but did so by June 2002, TDS had the option of paying off the claim, but was not obligated to do so. But if the FCC never reinstated the licenses or "fail[ed] to act . . . in a timely manner," the plan provided that TDS would obtain all of Airadigm's assets except the licenses. The plan was otherwise silent as to the FCC's exact interests in the licenses and what would happen if the FCC reinstated them after June 2002. And the plan didn't expressly preserve the FCC's security interest in the licenses, instead stating that the plan "shall not enjoin or in any way purport to limit, restrict, affect or interfere with action initiated by the FCC in the full exercise of its regulatory rights, powers and duties with respect to the Licenses."

The FCC never reinstated the licenses and maintained its position that it had validly cancelled them after Airadigm's 1999 bankruptcy. In 2003, the Supreme Court held otherwise in *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003). In nearly identical circumstances, the FCC had cancelled NextWave's C- and F-block licenses after it had filed for bankruptcy. The Court held that this action violated the bankruptcy code and set aside the FCC's decision. After its own bankruptcy in 1999, Airadigm had filed a petition before the FCC seeking to reinstate its cancelled licenses. On August 8, 2003, the FCC denied this

petition as moot, reasoning that, in light of *NextWave*, its cancellation of the licenses had been "ineffective." *In re Airadigm Communications, Inc.*, 18 F.C.C.R. 16296 (Aug. 8, 2003). Airadigm thus had its licenses back as though they had never been cancelled.

In light of this development, Airadigm filed a second petition for reorganization on May 8, 2006. As part of that reorganization, Airadigm filed the present adversary proceeding against the FCC, seeking to divest it of any continuing interests in the licenses. The bankruptcy court granted the FCC's motion for summary judgment and rejected Airadigm's claims.

Ultimately, on October 31, 2006, the bankruptcy court approved a second plan of reorganization, to which the FCC raised two general objections. The first went to the payment options under the plan. Even though Airadigm owed the FCC $64.2 million, the plan treated the FCC as a secured creditor for only $33 million—the then-current market value for the licenses. As a result, the FCC would have two options with respect to Airadigm's debt: It could take an immediate payout of $33 million[1] and lose its liens in the licenses; or it could treat its entire $64.2 million claim as secured and receive deferred payments totaling this greater amount over a number of years. Under the latter option (called a § 1111(b) election), the FCC would retain liens for the full $64.2 million and Airadigm would purchase and hold $33 million of government-backed securities or low-risk annuities.

---

[1] Airadigm could elect to surrender some or all of its licenses back to the FCC. The value of these surrendered licenses would then be subtracted from the secured amount. For present purposes, we assume that Airadigm will not make that election.

Airadigm would use the interest or payments from these instruments to make deferred payments to the FCC over (at most) a thirty-year period. When the payments totaled $64.2 million, the liens would expire. If Airadigm sold the licenses before making full payment, the FCC would receive the proceeds of the sale and, if the sale amount was less than $64.2 million, retain its liens in the licenses.

The FCC argued in the bankruptcy court that this last provision did not square with the code. Specifically, the FCC argued that a "due on sale" provision set out in its regulations—stating that the full auction bill is due if Airadigm transfers the licenses to a third party that would not otherwise qualify for installment payments—was part of the lien it held in a license. The FCC wanted the full $64.2 million at the time of a sale to a non-qualifying third party, not the proceeds of the sale plus a continuing lien in the licenses. Thus, in the FCC's estimate, the plan's failure to preserve this provision meant that the FCC had not "retain[ed] its liens" as required by the bankruptcy code. The bankruptcy court disagreed, reasoning that due-on-sale provision was not part of the lien itself and was instead contractual and subject to modification in bankruptcy.

The FCC's second objection went to a provision that released the third-party financier, TDS, from liability for "any act or omission arising out of or in connection with the . . . confirmation of this Plan . . . except for willful misconduct." Airadigm owed TDS over $188 million in secured claims, debt that Airadigm would somehow have to finance if TDS were not involved in the reorganization. In the bankruptcy court's estimate, there was "adequate" proof that TDS would not go forward with-

out the limitation on liability ultimately contained in the plan. The court held that the release was reasonable given both TDS's centrality to the reorganization and the potential for liability should TDS engage in "willful misconduct."

Both parties appealed to the district court, who affirmed the bankruptcy court's decisions in relevant respects. Notably, for the first time before the district court, the FCC challenged the rate at which the securities or annuities would pay out should the FCC make the § 1111(b) election. The FCC wanted a higher interest rate to move the secured $33 million up to $64.2 million at a quicker pace, theoretically compensating the FCC for the risk that Airadigm would not ultimately pay over the accrued amounts. The district court held that the FCC had waived this claim by not presenting it before the bankruptcy court. In the alternative, the court reasoned that the full-payment option complied with the terms of the bankruptcy code and rejected the claim. This appeal followed.

## II. Discussion

In their respective appeals, the parties raise two issues each. Airadigm first argues that the bankruptcy and district courts erred in holding that the FCC's security interests in the C- and F-block licenses were not extinguished by the 2000 reorganization plan. In addition, Airadigm argues that the courts below erred in holding that Airadigm could not avoid the FCC's interests in the licenses under 11 U.S.C. § 544(a)(1), the "strong-arm" provision of the bankruptcy code. In its cross-appeal, the FCC challenges its treatment as an undersecured creditor

in the 2006 reorganization plan. Finally, the FCC argues that the 2006 reorganization plan's provision limiting TDS's liability to "willful misconduct" does not comport with the bankruptcy code. The following sections discuss each in turn.

### A. FCC's Interests in the Licenses Following the 2000 Reorganization

The 2000 reorganization proceeded under the assumption that the FCC had validly cancelled Airadigm's licenses after it declared bankruptcy in 1999, and thus the plan made no mention of the status of the FCC's security interests following the reorganization. But the *NextWave* decision proved this assumption wrong. The anti-discrimination provision of the bankruptcy code, 11 U.S.C. § 525(a), prohibits the FCC from cancelling PCS licenses just because a license-holder has entered bankruptcy. Now the parties dispute the effect of the 2000 reorganization plan's silence in light of *NextWave*. Both the bankruptcy court and the district court held that the silence did not extinguish the FCC's continuing interests—decisions involving mixed questions of fact and law that we review de novo. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004). For the reasons set out below, we affirm.

Under some circumstances, a reorganization plan's silence regarding a creditor's continuing secured interest in the debtor's property can result in the elimination of the creditor's lien. Section 1141(c) of the bankruptcy code provides that "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors. . . ." 11 U.S.C. § 1141(c). As applied to liens and security interests, this means that "unless the

plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation." *In re Penrod*, 50 F.3d 459, 463 (7th Cir. 1995). This "default rule" applies provided that the creditor "participated in the reorganization" and, as required by § 1141(c) and at issue here, the property was "dealt with by the plan." *Id.* In other words, if a secured creditor participates in the debtor's bankruptcy and the ultimate plan does not preserve the creditor's interest, the interest is gone.

We first articulated this rule in *In re Penrod*. The Penrods were a family of hog farmers who had given security interests in their hogs to Mutual Guaranty Corporation in exchange for a $150,000 loan. The Penrods soon filed for bankruptcy, and Mutual Guaranty then filed a proof of claim. The resulting reorganization plan provided that the Penrods would pay back the remainder of the $150,000 loan in full plus interest. But the plan said nothing about Mutual Guaranty's original liens. When the Penrods sold their hogs for slaughter after the reorganization, Mutual Guaranty sought to enforce its liens in the proceeds of the sale, as it could have done under the original security agreement. This Court, applying the rule stated above, held that Mutual Guaranty's security interests in the hogs were gone, replaced by the payment schedule. The absence of an express provision in the plan gave rise to the presumption that Mutual Guaranty had, in effect, "give[n] up [its] preexisting liens" in exchange for the stream of payments. 50 F.3d at 463.

Neither party denies that the FCC "participated in the [2000] reorganization" or that the security interests in the licenses would otherwise constitute "interests of creditors" under § 1141(c). But the parties do dispute whether the

2000 reorganization plan "dealt with" the licenses so as to pull them within the ambit of § 1141(c)'s "default rule." Airadigm points to the provisions in the 2000 plan that set out the various payment options should the FCC ever reinstate the licenses. For example, if the FCC had reinstated the licenses by February 2001, TDS would pay the FCC's claim in full. Or, barring that, if the FCC reinstated the licenses by June 2002, TDS had the option of paying the claims, but was not required to do so. These contingencies should suffice, in Airadigm's view, to show that the plan "dealt with" the licenses. Because the plan did not expressly preserve the FCC's continuing interests, *Penrod* applies, and the FCC's secured interests in the licenses would be gone, relegating it to the heap of unsecured creditors. The FCC, on the other hand, argues that the bankruptcy court was correct in holding that a plan cannot "deal[ ] with" a security interest in a license if everyone erroneously believed that the licenses were validly cancelled. We agree.

The 2000 reorganization plan's silence regarding the FCC's security interests did not extinguish its continuing interests in the licenses. A chapter-11 reorganization "modifies the capital structure of a bankrupt enterprise." *Penrod*, 50 F.3d at 462. In reorganizing the bankrupt entity, a secured creditor's interests in the debtor's property can be "dealt with" in a variety of ways: through modification, impairment, exchange, or even elimination. *See, e.g.*, 11 U.S.C. § 1129(b)(2)(A)(I) (permitting secured creditors to retain the liens); 11 U.S.C. § 1129(b)(2)(A)(i)(II) (permitting approval of plan that exchanges the liens for "deferred cash payments"); 11 U.S.C. § 1129(b)(2)(A)(iii) (permitting exchanging the liens for "indubitable equivalent" of the value of creditor's secured claim); 11 U.S.C.

§ 1126(d) (permitting impairment of some interests if two-thirds of other creditors in class approve). Among other things, these powers facilitate the reorganization. *See In re Regional Bldg. Systems, Inc.*, 254 F.3d 528, 532 (4th Cir. 2001). A creditor wants to get something for its secured interest, and these provisions allow the creditor to do so, such as an interest in the reorganized business. The debtor also emerges from bankruptcy with property cleansed of all hidden liens, ensuring that future businesses will transact with the reorganized entity without fear that an unanticipated creditor will emerge with a superior interest in purchased property. *Penrod*, 50 F.3d at 463; *In re Regional Bldg. Systems, Inc.*, 254 F.3d at 533.

*Penrod* recognizes the practical reality that if it appears that a creditor has received some sort of payment or otherwise had its interest in property affected during the reorganization, the parties did not also agree to allow the creditor to keep its lien after the reorganization unless the plan specifically says so. Section 1141(c) and the default rule announced in *Penrod* ensure that a potential creditor can look to a reorganization plan to determine the extent of any other creditor's continuing interest in property after the reorganization. *Penrod*, 50 F.3d at 463. If the property is "dealt with" by the plan, the property is "free and clear of all claims and interests of creditors." 11 U.S.C. § 1141(c).

But for the plan to "deal[ ] with" property for purposes of § 1141(c), the plan itself must give some indication that it has compensated the creditor for or otherwise impliedly affected its interest. In other words, there must be some evidence that the powers to affect the creditor's interest contained in the bankruptcy code—to exchange, extinguish, impair or otherwise impact the interest—have

in some way been exercised—whether expressly or impliedly. In *Penrod*, the plan clearly "dealt with" the bank's liens in the hogs. Mutual Guaranty was entitled to a full payment plus interest for the rest of the amount owed by the Penrods after the reorganization, and Mutual Guaranty only participated in the bankruptcy because of its interest in the hogs. The inference was that the payments contained in the plan compensated Mutual Guaranty for its contingent property right in the hogs and thus extinguished that interest after reorganization. *See generally In re Regional Bldg. Sys., Inc.*, 254 F.3d at 530-33.

Not so here. Everyone, including the bankruptcy court, the creditor, and the debtor, assumed that the FCC had validly cancelled the licenses. The plan thus only affected or mentioned the licenses to the extent that the FCC would eventually reinstate Airadigm's interests in the licenses, an event that never came to pass. The plan itself referred to PCS licenses as the "Reinstated Licenses" throughout, defining them as those "Licenses as to which the FCC grants by Final Order the relief requested by the Debtor in the Petition for Reinstatement." To the extent that the FCC would receive any future payment from Airadigm for "Allowed claims," it would only occur "[o]n the Reinstatement Payment Date," meaning the "third Business Day after the" FCC reinstated the licenses. Finally, the plan set out contingencies should the FCC reinstate the licenses before June 2002, but made no provision for anything after this date. A potential creditor transacting with Airadigm after June 2002 could not look to the plan to determine any other creditor's potential interests in the licenses because the plan did not purport to affect the licenses in any way if the FCC did not reinstate them before June 2002. As a result, the 2000 plan

did not "deal[ ] with" the licenses in the event that the FCC did not reinstate them, and this Court's rule from *Penrod* does not control.

### B. Applicability of the "Strong Arm" Provision to the FCC's Interests

Airadigm also appeals the lower courts' conclusions that the FCC's liens could not be avoided under § 544(a) of the bankruptcy code, a decision regarding a mixed question of law and fact that we review de novo. *Mungo*, 355 F.3d at 974. Airadigm, as the debtor-in-possession, has the "rights and powers of . . . a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien" on the property in question. 11 U.S.C. § 544(a)(1). This "strong arm" power functions much like a foreclosure. If at the time of Airadigm's filing some hypothetical unsecured creditor could have obtained a judicial lien superior to the interest of the party bringing a secured claim in the bankruptcy proceeding, the estate can avoid the interest. *See In re Leonard*, 125 F.3d 543, 545 (7th Cir. 1997). But unlike a regular foreclosure, the property simply becomes the estate's free of the secured lien. Here, if some hypothetical creditor could have obtained an interest superior to the FCC's at the time of Airadigm's filing, the FCC will become an unsecured creditor with respect to the licenses.

To resolve the question, we must look to the rules governing the FCC's interests in the licenses. For although the "strong arm" power comes from federal bankruptcy law, the rules governing the perfection of security interests do not. In the mine-run case—for example one con-

cerning a private creditor's interest in a tractor or some type of inventory—state law governs. But when the property in question falls outside of state commercial codes by virtue of the federal interest or the nature of the property, federal law provides the rule of decision. *Grogan v. Garner*, 498 U.S. 279, 283-84 & n. 9 (1991). In such instances, if a federal statute speaks to the issue directly, the court will look no further. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979). Barring that, courts can either adopt state law as the rule of decision, *see, e.g., Kimbell Foods, Inc.*, 440 U.S. at 729; *see also Powers v. U.S. Postal Svce.*, 671 F.3d 1041, 1043 (7th Cir. 1982), or craft a federal rule of common law. *See, e.g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943). The issues before us are whether state or federal law governs the perfection of the FCC's interests in the licenses and, if the latter, what federal law demands.

Airadigm argues on appeal that Wisconsin law should govern the perfection of the FCC's interests in the licenses. After the 1996 auction, the FCC executed fifteen security agreements, and Airadigm signed fifteen promissory notes for the amounts owed. Initially, the FCC filed financing statements in Wisconsin to perfect its interests in the licenses. But financing statements lapse after five years, and the FCC didn't renew them when the time came in June and July 2002, waiting until June 2006 to file a continuation statement. *See* WIS. STAT. § 409.515(1), (3) (2003). Due to this lapse, if Wisconsin law (or more generally the UCC) governs, the FCC's interests would be unperfected—and thus avoidable—due to this failure to renew.

But neither the UCC nor Wisconsin law decides the issue, as federal statutory and regulatory law prevent a hypothetical lien creditor from obtaining a superior inter-

est in an FCC license for purposes of the bankruptcy code. The liens held by the FCC are unlike liens held by the federal government as part of other federal lending programs, where the lien secures the loan by attaching to property that is otherwise defined by state law. *See, e.g., United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 737 (1979). Instead, the property itself—the license—is a creature of federal law. Accordingly, federal law also defines the FCC's retained interest in that license. *Cf. id.* at 734-35 (contrasting federal interest in tax liens with its interest in consensual liens). And as defined by federal law, the FCC does not have to perfect its interest in a spectrum license because federal law prevents another creditor from holding a superior interest.

The licenses created by the Communications Act, as amended in 1993, "maintain the control of the United States over all the" invisible spectrum. 47 U.S.C. § 301. The licenses give permission "for the use of such channels, but not the ownership thereof," and "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." *Id.* Although these licenses provide license-holders the right to exclude, they are not freely transferable as no license "or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, . . . except upon application to the Commission." 47 U.S.C. § 310(d). Even then, the Commission will only approve the transfer "upon finding . . . that the public interest, convenience, and necessity will be served thereby." *Id.*

The rules governing the auctions themselves also preserve the FCC's interests in the licenses. In 1993, Congress gave the FCC the authority to "grant [a] license or

permit to a qualified applicant through a system of competitive bidding" that would "recover[ ] for the public . . . a portion of the value of the public spectrum resource made available for commercial use." 47 U.S.C. § 309(j)(1), (j)(3)(C). In so doing, the Commission was required to "consider alternative payment schedules and methods of calculation, including . . . guaranteed installment payments." *Id.* at 309(j)(4)(a). Pursuant to this authority, and after a notice-and-comment period, *see In re Implementation of Section 309(j) of the Communications Act*, 9 F.C.C.R. 5532 (1994), the FCC crafted regulations governing the auction and the installment plan. These regulations conditioned a successful bidder's use of the licenses "upon the full and timely performance of the licensee's payment obligations under the installment plan." 47 C.F.R. § 1.2110(g)(4). And finally, the very "terms of the . . . license[s]"—which 47 U.S.C. § 301 provided would define any "right" in them—stated that they were "conditioned upon the full and timely payment of all monies due pursuant to" the regulations and the security agreements.

These statutory and regulatory provisions indicate that federal law precludes a private party from obtaining a superior interest to the FCC. Generally, when a lien-creditor forecloses on a lien, the affected property is sold, and the lien-creditor recovers its debt from the proceeds of the sale. In terms of priority, a lien-creditor receives payment prior to any secured creditor whose interest is unperfected. *See, e.g.*, U.C.C. § 9-317(a)(2). In other words, the unperfected secured creditor—in this case, the FCC—will not get paid anything unless there is money left over after superior creditors recover from the proceeds of the sale. 3-28 DEBTOR-CREDITOR LAW § 28.03.

But if the forced sale of the PCS licenses were to occur

with the FCC as merely an unperfected secured creditor, the sale would conflict with the statutes and regulations covering the FCC's licensing scheme. This conflict gives rise to a negative inference—controlling in this case—that federal law does not allow private creditors to obtain an interest in PCS licenses superior to the FCC's. In the first place, a judicially enforced sale would mean that a "transfer" of the licenses occurred without an "application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d); *see also FCC v. WOKO, Inc.*, 329 U.S. 223, 229 (1946).

In addition, if the lien-holder were to be paid before the FCC, this would conflict with 47 U.S.C. § 301 and 47 C.F.R. § 1.2110(g)(4). Section 301 provides for the "use" of licenses subject to the "terms, conditions, and periods of the license." And the "terms . . . of the license[s]" require that the licensee make "full and timely payment of all monies due." The FCC's regulations, crafted after Congressional authorization and a notice-and-comment period, similarly predicate the auction-winner's use of the licenses on "the full and timely performance of the licensee's payment obligations under the installment plan." 47 C.F.R. § 1.2110(g)(4). Pursuant to Congress's command to "recover . . . a portion of the value of the public spectrum resource," the FCC made full payment a regulatory condition on the use of the invisible spectrum when implementing the installment plan. Subordinating its interests to that of a private lien-creditor would conflict with the FCC's statutory and regulatory authority.

As a result, under federal non-bankruptcy law the rights afforded to a hypothetical lien creditor at the time of Airadigm's filing could not have been superior to the

FCC's interests in the licenses. Accordingly, the lower courts were correct to conclude that Airadigm cannot avoid the FCC's interests in the licenses under 11 U.S.C. § 544(a). We conclude by noting that we do not decide whether a private party can in fact take an interest in the proceeds of PCS licenses.[2] This decision is unnecessary

---

[2] A previous decision of this Court, *In re Tak Communications*, 985 F.2d 916 (7th Cir. 1993), held that a "creditor may [not] hold a security interest in [a] license." This decision reflected the FCC's stated policy at the time, *see In re Tak*, 985 F.2d at 918-19; *In re Twelve Seventy, Inc.*, 1 F.C.C.2d 965, 967 (1965), and ended with the proviso that any change in this policy was "a matter for the FCC rather than the courts to decide." *In re Tak*, 985 F.2d at 919. A subsequent decision coming from within the FCC then expressly disagreed with *In re Tak*. The Chief of the Mobile Services Division held that, despite the FCC's general "policy against a licensee giving a security interest in a license," a "security interest in the proceeds of the sale of a license does not violate Commission policy." *In re Cheskey*, 9 F.C.C.R. 986, 987 & n.8 (Mobile Serv. Div. 1994). Other circuits have found this statement persuasive. *See, e.g.*, *MLQ Investors, L.P. v. Pacific Quadracasting, Inc.*, 146 F.3d 746, 748-49 (9th Cir. 1998); *In re Beach Television Partners*, 38 F.3d 535, 537 (11th Cir. 1994). But the FCC has not argued before this Court that this decision is entitled to *Chevron* deference, which would have meant that the FCC effectively overruled *In re Tak*. *See Nat'l Cable & Telecommunications Inc. v. Brand X Internet Svces.*, 545 U.S. 967, 982-84 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."). Nor is *Chevron* deference likely given that the Commission subsequently

(continued...)

because, regardless what interest a license-holder can give a creditor in these licenses, it could not be superior to the FCC's for purposes of 11 U.S.C. § 544(a).

### C. FCC's Treatment as an Undersecured Creditor

In its cross-appeal, the FCC challenges its treatment as an undersecured creditor. Airadigm still owes the FCC $64.2 million for the licenses it purchased. But if the licenses had been sold at the time of Airadigm's 2006 reorganization, the going rate was only $33 million. So the bankruptcy court treated the FCC as an undersecured creditor in the 2006 reorganization plan. 11 U.S.C. § 506(a). The plan, tracking the bankruptcy code, gave the FCC two options. It could either receive immediate payment for the entirety of its $33 million secured claim and treat the remaining $31.2 million as unsecured. *Id.* Or it could opt to treat the entire allowed $64.2 million claim as secured and receive a deferred stream of payments from Airadigm over a number of years. *See* 11 U.S.C. §§ 1111(b)(1), (b)(2), 1129(b)(2)(A)(i)(II). To finance this stream of payments, Airadigm would purchase

---

[2] (...continued)
declined to adopt this policy in affirming the Chief's order in *Cheskey*. *See In re Cheskey*, 13 F.C.C.R. 10656, 10659-60 (1998) (expressly declining to reach issue); 47 U.S.C. §§ 154(i) (powers of Commission), 155(c)(1)-(6) (powers, unused in *Cheskey*, to delegate authority to an employee of the FCC). Accordingly, because the answer to this question is not necessary for our decision and because "it is [not] clear that a private party *can* take and enforce a security interest in an FCC license," *NextWave*, 537 U.S. at 307, it is for a future case (or the FCC) to readdress the matter if necessary.

$33 million of government-backed securities or annuities and would then use the interest from this principal to pay the FCC over a term of years. In the alternative, Airadigm could choose to pay the FCC from the proceeds of the sale of the licenses. Should the FCC opt to treat the whole claim as secured, it would retain its liens in the licenses until it receives full payment, at which point the liens would expire. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I); *see generally* 7-1111 COLLIER ON BANKRUPTCY P.1111.03 (15th ed. 2007).

The FCC raises two objections related to the plan's provisions should it make the so-called § 1111(b) election. The first need not detain us because it is waived. The FCC argued for the first time in its appeal to the district court that it was entitled to a higher interest rate on the $33 million worth of securities. In short, the FCC claimed that there is a risk that Airadigm will abscond with the principal and accrued interest, and it wants the $64.2 million to accrue at a higher interest rate to compensate for this risk. For this Court to entertain the merits of this claim, which are questionable in this context, the FCC must have raised it before the bankruptcy court so as to preserve it for appeal. *See In re Rimsat, Ltd.*, 212 F.3d 1039, 1048 (7th Cir. 2000). The FCC concedes that it didn't, so the claim is waived.

The FCC's second claim is that the bankruptcy court did not properly preserve the liens securing its claim in the licenses because it did not keep the FCC's due-on-sale rights in the plan of reorganization. To approve of a plan over the objection of a secured creditor, the bankruptcy plan must "retain the liens securing [a secured creditor's] claims." 11 U.S.C. § 1129(b)(2)(A)(i)(I). The FCC's regulations provide that a licensee who obtained its licenses

under the installment plan must pay back the full amount if it seeks to transfer the licenses to an entity that wouldn't otherwise qualify for the installment plan. 47 C.F.R. § 1.2111(c)(1). Because, in the FCC's estimation, the 2006 plan does not preserve the due-on-sale provision, it does not "retain the liens" and the plan cannot be "crammed down" over its objection. The district court disagreed with the FCC, a decision involving statutory interpretation that we review de novo. *In re Till*, 301 F.3d 583, 586 (7th Cir. 2002), *rev'd in part on other grounds*, 541 U.S. 465 (2004).

The issue before the Court is what to make of the FCC's regulations for purposes of the bankruptcy code. As the Supreme Court's decision in *NextWave* makes clear, the FCC participates in a debtor's bankruptcy as a creditor subject to the terms of the bankruptcy code. 537 U.S. 293, 302-03 (2003). Unlike most creditors, the FCC is a creature of federal statutory law and a source of regulatory laws. These laws can come into conflict or at least create tension with the bankruptcy code. In the event that the FCC has issued regulations that conflict with the requirements of the bankruptcy code, *NextWave* commands that the former give way.[3] For example, even though FCC regulations state that when a license-holder is in "default, its license shall automatically cancel," 47 C.F.R. § 1.2110(g)(iv), the bankruptcy code prevents the FCC from cancelling a license "solely because such . . . debtor . . . has not paid a debt that is dischargeable in the case under this title." 11

---

[3] In the event that the bankruptcy code conflicted with the statutes governing the FCC, a different situation—one not presented here—would arise. *See United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 550-51 (1990).

U.S.C. § 525(a); *see also NextWave*, 537 U.S. at 302. The bankruptcy code governs due to the time-honored rule of legislative supremacy. *See, e.g.*, *Butner v. United States*, 440 U.S. 48 (1979) (superseded in part by Pub. L. 103-394); *see also Diersen v. Chicago Car Exchange*, 110 F.3d 481, 486 (7th Cir. 1997).

Things are somewhat more complicated, however, where the FCC's regulations do not conflict with the bankruptcy code, but instead contain substantive obligations with which the bankruptcy court must contend. In this case, the FCC's regulations provide that "[i]f a licensee that utilizes installment financing under this section seeks to assign or transfer control of its license to an entity not meeting the eligibility standards for installment payments, the licensee must make full payment of the remaining unpaid principal." 47 C.F.R. § 1.2111(c)(1). On the one hand, a bankruptcy court cannot nullify the effect of a duly enacted regulation as part of the plan unless the regulation conflicts with the bankruptcy code or otherwise falls within the ambit of the powers conferred upon the court. *Cf. generally Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494 (1986). In providing the debtor with a "fresh start," the bankruptcy court could not bolster the reorganization with a prospective freedom from all regulation. *See, e.g.*, *Ohio v. Kovacs*, 469 U.S. 274, 284-85 (1985). Conversely, the bankruptcy court has broad powers under the code to modify terms of payment for a "claim." *NextWave*, 537 U.S. at 302. This power obtains with no less sweep when the terms of payment are contained in federal regulations. *Id.* ("[W]here Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly,

rather than by a device so subtle as denominating a motive a cause.").

In these circumstances and for purposes of the cramdown provision, the bankruptcy court must first ensure that the plan complies with the bankruptcy code and, second, ensure that, if the plan affects the FCC's regulations, it has done so pursuant to a specific power that Congress has conferred upon the bankruptcy court. In light of this framework, we affirm. The due-on-sale provisions contained in the FCC's regulations do not constitute part of its lien that the bankruptcy court had to "retain" in order to approve the plan pursuant to § 1129. The bankruptcy code defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). The due-on-sale provision contained in the federal regulation is not a "charge against or interest in property" but is instead a regulation regarding the terms of payment for the debt. A creditor can take a lien in exchange for a loan and require payment over any period of time, subject to nearly any rate of interest and with prepayment penalties or acceleration clauses. And a creditor can use a due-on-sale provision to prevent third-party assumption of desirable financial or lending conditions governing a secured interest. *See generally* 6-51 DEBTOR-CREDITOR LAW § 51.09. This is what the FCC has done with the regulation at issue. Such regulatory terms do not affect or attend the FCC's underlying lien so that the bankruptcy court must "retain" them in a plan, but are instead simple terms of payment.

In addition, the bankruptcy plan does not purport to affect the FCC's powers to regulate outside of bankruptcy, including through the due-on-sale provision. Accordingly, there is no question that this provision falls within

the power of the bankruptcy court. The plan provides that "[w]hen the [FCC] has received the payments required [by the plan] . . . then the . . . Claim will be satisfied in full, and such holder will have no further right or interest in or to [sic] such securities or annuity contracts, which will then become the exclusive property of the Reorganized Debtor." These "payments" can be made "either from the proceeds of such securities or annuity contracts, the proceeds of a sale of the corresponding License or Partial License, direct payment by the Reorganized Debtor, or any assignee, designee or successor of the Reorganized Debtor, or otherwise." The plan does not require the FCC to approve of a particular sale to repay the amounts owed. Nor does it affect the FCC's regulatory powers should Airadigm decide to sell the licenses to a party that would not qualify for installment payments. It merely states that should Airadigm sell the licenses such that the FCC "has received the payments required" by the plan, then the FCC will not have any continuing interest in the underlying "securities or annuity contracts" that would otherwise provide the stream of payments. Because the plan "retain[ed] the liens" and did not otherwise affect the FCC's regulatory authority, the bankruptcy court did not err by omitting reference to the due-on-sale provisions in the 2006 reorganization plan.

### D.  Release of TDS from Liability

Finally, the FCC challenges the fact that the 2006 plan releases TDS from all liability "in connection with" the reorganization except for willful misconduct. The plan, as is relevant, states "[e]xcept as expressly provided . . . [TDS shall not] have or incur any liability to . . . any holder

of any Claim . . . for any act or omission arising out of or in connection with the Case, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or property to be distributed under this Plan, except for willful misconduct." The FCC argues that this violates the bankruptcy code and was therefore improper. For the reasons set out below, we disagree.

The question whether a bankruptcy court can release a non-debtor from creditor liability over the objections of the creditor is one of first impression in this circuit. *See In re Specialty Equipment, Co.*, 3 F.3d 1043, 1046-47 (7th Cir. 1993) (approving of consensual non-debtor releases); *see also Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir. 1982) (holding under previous version of bankruptcy code that such releases are improper). And the circuits that have addressed the matter have set out a variety of approaches. Some have held that a non-consensual release of liability violates the bankruptcy code and is thus beyond the power of the bankruptcy court. *See In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995); *In re Western Real Estate*, 922 F.2d 592, 600 (10th Cir. 1990). Others permit the releases but have splintered on the governing standard. *See, e.g.*, *Deutsche Bank AG v. Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (permitting release if it is "important" to reorganization); *Gillman v. Continental Airlines* (*In re Continental Airlines*), 203 F.3d 203, 214 (3d Cir. 2000); *In re A.H. Robins, Co.*, 880 F.2d 694, 701-02 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) (setting out a seven-factor balancing test).

The nub of the circuits' disagreement concerns two interrelated questions, one of which we have already resolved and another that we answer here. The first is

whether § 524(e) of the bankruptcy code bars a bank-ruptcy court from releasing non-debtors from liability to a creditor without the creditor's consent. *See, e.g.*, *Lowenschuss*, 67 F.3d at 1401 (yes); *Deutsche Bank AG*, 416 F.3d at 142 (no). Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of another entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The natural reading of this provision does not foreclose a third-party release from a creditor's claims. *Specialty Equipment*, 3 F.2d at 1047. Section 524(e) is a saving clause; it limits the operation of other parts of the bankruptcy code and preserves rights that might otherwise be construed as lost after the reorganization. *Id.*; *see also In re Hunter*, 970 F.2d 299, 311 (7th Cir. 1992). Thus, for example, because of § 524, a creditor can still seek to collect a debt from a co-debtor who did not participate in the reorganization—even if that debt was discharged as to the debtor in the plan. *Compare* 11 U.S.C. § 524(a)(2) *with* 11 U.S.C. § 524(e). Or a third party could proceed against the debtor's insurer or guarantor for liabilities incurred by the debtor even if the debtor cannot be held liable. *See In re Shondel*, 950 F.2d 1301, 1306-07 (7th Cir. 1991); *see also In re Hendrix*, 986 F.2d 195, 197 (7th Cir. 1993).

In any event, § 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claims. If Congress meant to include such a limit, it would have used the mandatory terms "shall" or "will" rather than the definitional term "does." And it would have omitted the prepositional phrase "on, or . . . for, such debt," ensuring that the "discharge of a debt of the debtor *shall* not affect the liability of another en-tity"—whether related to a debt or not. *See* 11 U.S.C. § 34

(repealed Oct. 1, 1979) ("The liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt.") (prior version of § 524(e)). Also, where Congress has limited the powers of the bankruptcy court, it has done so clearly—for example, by expressly limiting the court's power, *see* 11 U.S.C. § 105(b) ("[A] court may not appoint a receiver in a case under this title"), or by creating requirements for plan confirmation, *see, e.g.*, 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if the following requirements are met . . . ."). As a result, for the reasons set out in *Specialty Equipment*, § 524(e) does not bar a non-consensual third-party release from liability.[4]

The second related question dividing the circuits is whether Congress affirmatively gave the bankruptcy court the power to release third parties from a creditor's claims without the creditor's consent, even if § 524(e) does not expressly preclude the releases. A bankruptcy court "appl[ies] the principles and rules of equity jurisprudence," *Pepper v. Litton*, 308 U.S. 295, 304 (1939), and its

---

[4] This Court had previously held that all non-debtor releases were prohibited under the prior version of the bankruptcy code. *Union Carbide Corp. v. Newboles*, 686 F.2d 593 (7th Cir. 1982). The language before these 1979 modifications—the 1982 case applied the pre-amendment version of the code—quite explicitly answered the question at issue here. It provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." 11 U.S.C. § 34 (repealed Oct. 1, 1979). Given Congress's elimination of the statutory language that formerly decided the issue, *Union Carbide* is no longer controlling on this point of law.

equitable powers are traditionally broad, *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549 (1990). Section 105(a) codifies this understanding of the bankruptcy court's powers by giving it the authority to effect any "necessary or appropriate" order to carry out the provisions of the bankruptcy code. *Id.* at 549; 11 U.S.C. § 105(a). And a bankruptcy court is also able to exercise these broad equitable powers within the plans of reorganization themselves. Section 1123(b)(6) permits a court to "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). In light of these provisions, we hold that this "residual authority" permits the bankruptcy court to release third parties from liability to participating creditors if the release is "appropriate" and not inconsistent with any provision of the bankruptcy code.

In this case, the bankruptcy court did not exceed its authority in granting the limitation on TDS's liability. Ultimately, whether a release is "appropriate" for the reorganization is fact intensive and depends on the nature of the reorganization. Given the facts of this case, we are satisfied that the release was necessary for the reorganization and appropriately tailored. First, the limitation itself is narrow: it applies only to claims "arising out of or in connection with" the reorganization itself and does not include "willful misconduct." *See Deutsche Bank*, 416 F.2d at 142 (noting that "potential for abuse is heightened when releases afford blanket immunity"). This is not "blanket immunity" for all times, all transgressions, and all omissions. Nor does the immunity affect matters beyond the jurisdiction of the bankruptcy court or unrelated to the reorganization itself. *See* 28 U.S.C. § 157(b); *Cf. In re Johns-Manville Corp.*, 2008 U.S. App. LEXIS 3228 (2d

Cir. Feb. 16, 2008). Thus, should TDS have recklessly committed some wrong during the 2000 or 2006 proceedings, it would still be liable to the FCC or any other third party. Second, the limitation is subject to the other provisions of the plan, including one that expressly preserves the FCC's regulatory powers with respect to the licenses. Therefore, TDS cannot use this limitation as a way of skirting the FCC's regulations regarding the use, possession, or transfer of the licenses. Third, the bankruptcy court found "adequate" evidence that TDS required this limitation before it would provide the requisite financing, which was itself essential to the reorganization. *See Deutsche Bank*, 416 F.3d at 143. Airadigm owes TDS $188,264,000 for its secured claims, and it owes the FCC another $33 million in secured claims for the licenses. As the bankruptcy court found, without TDS's involvement, Airadigm would be on the hook for over $221 million in debt—an amount that some other would-be financier would not likely pay considering Airadigm's financial situation. Absent TDS's involvement, the reorganization simply would not have occurred. Given how narrow the limitation is and how essential TDS was for the reorganization, the release is "appropriate" and thus within the bankruptcy court's powers.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's decision affirming the bankruptcy court.

---