In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3263

IN RE:

RIVER EAST PLAZA, LLC,

*Debtor.*

APPEAL OF:

RIVER EAST PLAZA, LLC and GENEVA
LEASING ASSOCIATES, INC., *et al*.

LNV CORPORATION,

*Appellee.*

Appeal from the United States Bankruptcy Court
for the Northern District of Illinois, Eastern Division.
No. 11 B 05141—**Eugene R. Wedoff**, *Bankruptcy Judge*.

ARGUED DECEMBER 6, 2011—DECIDED JANUARY 19, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This is an appeal directly to us, skipping the district court, from the dismissal of what is called a "single asset real estate" bankruptcy proceeding. The debtor, River East Plaza, LLC, is the principal appellant. The appellee, LNV Corporation, is River East's

principal creditor and had successfully urged the dismissal of the proceeding.

Section 158(d)(2)(A) of the Judicial Code authorizes a court of appeals to permit the district court to be bypassed if, so far as relates to this case, the order appealed from involves a question of law that has not been definitively resolved, or involves a matter of public importance, or if an immediate appeal "may materially advance the progress of the case." The first and last of these considerations point to our allowing this appeal—the last because, as we'll see, the Bankruptcy Code directs speedy resolution of single asset real estate bankruptcies for reasons well illustrated by this case. 11 U.S.C. § 362(d)(3); see *River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 645 (7th Cir. 2011), cert. granted under the name *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, No. 11-166, 2011 WL 3499633 (Dec. 12, 2011).

A single real estate asset, within the meaning of the Bankruptcy Code, is a nonresidential property, or a residential property containing five or more apartments or other residential units, "on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto." 11 U.S.C. § 101(51B). The single asset in this case is a building in downtown Chicago called River East Plaza that houses offices and a restaurant. LNV Corporation, a banking firm, has a first mortgage on the building.

The building's owner and mortgagor, River East Plaza, LLC, defaulted on the mortgage in February 2009, and

LNV promptly started foreclosure proceedings in state court, prevailed, and a foreclosure sale of the property was scheduled. That was almost three years ago, and the sale has yet to take place. For in February 2011, just hours before it was to occur, River East filed for bankruptcy under Chapter 11 (reorganization, as distinct from liquidation), and the filing automatically stayed the sale. 11 U.S.C. § 362(a)(4).

As a secured creditor, LNV could have bypassed the bankruptcy proceeding and continued its efforts to enforce its secured claim in state court. *In re Penrod*, 50 F.3d 459, 461-63 (7th Cir. 1995). But stymied by the automatic stay, it decided to become a party to the bankruptcy proceeding so that it could ask the bankruptcy judge, as it did, to lift the automatic stay. But by becoming a party it subjected itself to the authority of the bankruptcy judge to approve a plan of reorganization that might affect its lien. *Id*. at 462; *In re Airadigm Communications, Inc.*, 519 F.3d 640, 647-48 (7th Cir. 2008). Normally a mortgage lien remains a lien on the mortgaged property until the mortgage is paid off, even if the property is sold, because a lien runs with the property. But if the bankruptcy judge confirms a plan of reorganization that removes the lien of a participating creditor, the lien is gone. *Id*. at 648.

The creditor can try to protect himself against such a fate by objecting to the plan, and his objection will block it, see 11 U.S.C. § 1129(a)(8)(A), unless it can be crammed down his throat under one of the three subsections of 11 U.S.C. § 1129(b)(2)(A). Under (i), the reorganized

debtor keeps the property and may be allowed to stretch out the repayment of the debt beyond the period allowed by the loan agreement, but the lien remains on the property until the debt is repaid. Under (ii), the debtor auctions the property free and clear of the mortgage but the creditor is allowed to "credit bid," meaning to offer at the auction, not cash, but instead a part or the whole of his claim, *FDIC v. Meyer*, 781 F.2d 1260, 1264-65 (7th Cir. 1984), so that, for example, LNV could bid $20 million for River East's building just by reducing its claim from $38.3 million to $18.3 million. Under (iii), the lien is exchanged for an "indubitable equivalent." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304-05 (3d Cir. 2010); *In re Sun Country Development, Inc.*, 764 F.2d 406, 409 (5th Cir. 1985); *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (L. Hand, J.). The last subsection is the one River East invoked in its proposed plan of reorganization—unsuccessfully. The bankruptcy judge rejected the plan, lifted the automatic stay, and dismissed the bankruptcy proceeding.

A question before the Supreme Court in the *River Road* case (the case, cited earlier, now called *RadLAX Gateway Hotel*), but unnecessary to try to answer in this case, is whether the third form of cramdown, the "indubitable equivalent" cramdown, can be used to eliminate a creditor protection imposed under the second subsection, which allows encumbered property to be auctioned free and clear of an existing lien only if the lien creditor is allowed to credit bid at the auction. In *River Road* we rejected rulings by the Third and Fifth Circuits that

a plan allowing sale of property free and clear of a secured creditor's lien without letting the creditor credit bid can still be crammed down, under the third rather than the second subsection, so long as the plan provides some means of assuring that the creditor receive the indubitable equivalent of its claim. See *In re Philadelphia Newspapers, LLC*, *supra*, 599 F.3d at 311-13; *In re Pacific Lumber Co.*, 584 F.3d 229, 246-47 (5th Cir. 2009). We said that to allow the debtor in such a case to elude credit bids by convincing the bankruptcy court that it has given the creditor an indubitable equivalent in the form of substitute collateral would circumvent the procedure established by subsection (ii), and by so doing deprive the creditor of the opportunity conferred by that subsection to benefit from an increase in the value of the property if, the credit bid having been the high bid, the creditor becomes the owner of the encumbered property.

While the debtor in *River Road* sought to avoid the creditor's right to credit bid under subsection (ii) by invoking indubitable equivalence, River East seeks to avoid the requirement in a subsection (i) cramdown of maintaining the mortgage lien on the debtor's property by transferring LNV's lien to different collateral, also in the name of indubitable equivalence. The logic of *River Road* forbids such an end run, but even if the Supreme Court reverses *River Road*, River East's plan could not be confirmed because the substitute collateral that it proposed was not the indubitable equivalent of LNV's mortgage. (Later we'll explain when substitute collateral can be indubitably equivalent to the original collateral.)

LNV is owed $38.3 million but River East's building is currently valued at only $13.5 million (this is River East's valuation, and may as we'll see be too low). So LNV's secured claim is undersecured, and an undersecured creditor who decides, as LNV has decided, to participate in his debtor's bankruptcy proceeding has a secured claim for the value of the collateral at the time of bankruptcy and an unsecured claim for the balance. 11 U.S.C. § 1111(b)(1)(A). But generally he can exchange his two claims for a single secured claim equal to the face amount of the unpaid balance of the mortgage. §§ 1111(b)(1)(B), (2). LNV made this choice, so instead of having a secured claim for $13.5 million and an unsecured claim for $24.8 million it has a secured claim for $38.3 million and no unsecured claim.

The swap is attractive to a mortgagee who believes both that the property that secures his mortgage is undervalued and that the reorganized firm is likely to default again—which often happens: between a quarter and a third of all debtors who emerge from Chapter 11 with an approved plan of reorganization later re-enter Chapter 11 or have to restructure their debt (that is, default—"restructure" is just a euphemism for default) by some other method. See, e.g., Lynn M. Lopucki, *Courting Failure* 97-1222 (2005); Harvey R. Miller & Shai Y. Waisman, "Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?" 78 *Am. Bankr. L.J.* 153, 188-89 (2004); Stuart C. Gilson, "Transaction Costs and Capital Structure Choice: Evidence from Financially Distressed Firms," 52 *J. Finance* 161, 162 (1997); Edith Shwalb Hotchkiss,

"Postbankruptcy Performance and Management Turn-over," 50 *J. Finance* 3 (1995); Lynn M. LoPucki & William C. Whitford, "Patterns in the Bankruptcy Reorganization of Large, Publicly Held Companies," 78 *Cornell L. Rev.* 597, 608 (1993); but cf. Robert K. Rasmussen, "Empirically Bankrupt," 2007 *Colum. Business L. Rev.* 179, 223-27 (2007). The swap enables the creditor, in the event of a further default after the value of the property has risen, to apply a higher value of the collateral to the satisfaction of the debt than if he had accepted a secured claim equal to the lower value of the collateral at the time of bankruptcy. Had LNV chosen not to give up its unsecured claim in exchange for a larger secured claim, it would receive some fraction of its unsecured claim in the Chapter 11 proceeding, and would continue after the bankruptcy to have a $13.5 million claim secured by the building. The building would continue to be owned by the debtor if the latter had emerged from bankruptcy, having been permitted to reorganize. If the debtor later defaulted and the building was sold, LNV would realize a maximum of $13.5 million (the amount of its secured claim) from the sale, even if the building was sold for more. In contrast, given the swap, if the value of the building rose say to $20 million by the time the former debtor again defaulted, LNV, if allowed to foreclose, would realize all $20 million because his secured claim would exceed that amount. In June 2011, when LNV made its choice, the U.S. real estate market, commercial as well as residential, was severely depressed (as it still is), but LNV expected real estate prices to rise, which may be why it made that choice.

River East, joined by several creditors listed as appellants on River East's briefs but about which the briefs say very little and we shall say nothing, was unhappy with LNV's choice. Probably like LNV it expected the value of the building to appreciate and didn't want to share that appreciation with its creditor. Or maybe, as it argues, prospective financiers of the reorganized firm wanted to have a senior lien on the building. Whatever the precise motive, River East wanted LNV out of there and decided to seek confirmation of a plan of reorganization that would replace the lien on the building with a lien on $13.5 million in substitute collateral, namely 30-year Treasury bonds that would be bought by an investor in the reorganized firm. At current interest rates, River East argued, the bonds would grow in value in 30 years through the magic of compound interest to $38.3 million, thus guaranteeing that LNV would be repaid in full. The substitute collateral would be equivalent to LNV's lien.

The bankruptcy judge rejected the plan (River East's second plan—River East is not complaining about the rejection of the first, a rejection based on the plan's failure to comply with the cramdown statute once LNV chose to waive its unsecured claim in exchange for retaining a larger secured claim). Section 362(d)(3)(A) of the Code requires the bankruptcy judge, in a single asset real estate bankruptcy, upon the request of a party to "grant relief from the [automatic] stay . . ., such as by terminating, annulling, modifying, or conditioning such stay," unless within 90 days of the filing of the Chapter 11 petition "the debtor has filed a plan of

reorganization that has a reasonable possibility of being confirmed within a reasonable time." See *In re Williams*, 144 F.3d 544, 546 (7th Cir. 1998). When River East's second plan was rejected, the 90-day deadline had expired, and the bankruptcy judge at LNV's request vacated the automatic stay, thus allowing the long-delayed foreclosure sale to proceed. We stayed the sale pending the decision of this appeal. Once the stay is lifted and the sale takes place, there will be nothing left to reorganize, this being a *single*-asset bankruptcy. That's why, having decided to lift the automatic stay, the bankruptcy judge dismissed the bankruptcy proceeding.

River East argues that the reason LNV chose to convert the entire $38.3 million debt that it was owed to a secured claim is that it wanted to thwart the bankruptcy proceeding. No doubt. LNV wanted to foreclose its mortgage and doubtless expected to be the high bidder at the foreclosure sale and thus become the building's owner and so the sole beneficiary of any appreciation if and when the real estate market recovered. But there is nothing wrong with a secured creditor's wanting the automatic stay lifted so that it can maximize the recovery of the money owed it.

The bankruptcy judge stated flatly that a secured creditor cannot be forced to accept substitute collateral if the creditor has chosen to convert a combination of a secured and unsecured claim into a secured claim equal to the total debt that it is owed. Banning substitution of collateral indeed makes good sense when as in the present case the creditor is undersecured, unlike a case

in which he's oversecured, in which case the involuntary shift of his lien to substitute collateral is proper as long as it doesn't increase the risk of his becoming undersecured in the future. See, e.g., *In re Sun Country Development, Inc., supra*, 764 F.2d at 409; *In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 530-31 (S.D. Tex. 1990). It is proper because the existing lien may make it difficult for the debtor to obtain new financing, cf. *Olive Can Co. v. Martin*, 906 F.2d 1147, 1149 (7th Cir. 1990); *Spartan Mills v. Bank of America Illinois*, 112 F.3d 1251, 1255-56 (4th Cir. 1997); *Restatement (Third) of Property: Mortgages* § 7.3, comment e (1997), which he may need in order to be able to reorganize successfully; and provided the substitute collateral gives the creditor an ample cushion against becoming undersecured, he can have no reasonable objection to the substitution. The secured creditor is thus not allowed to "paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security." *In re James Wilson Associates*, 965 F.2d 160, 171 (7th Cir. 1992); see also *In re Pacific Lumber Co., supra*, 584 F.3d at 247.

Substituted collateral that is more valuable and no more volatile than a creditor's current collateral would be the indubitable equivalent of that current collateral even in the case of an undersecured debt. But no rational debtor would propose such a substitution, because it would be making a gift to the secured creditor. And a case in which the creditor, by making the choice authorized by section 1111(b), gives up his unsecured claim—the amount by which the debt exceeds the present value of the security—is a case of an undersecured claim. The debtor's only motive for substitution of col-

lateral in such a case is that the substitute collateral is likely to be worth less than the existing collateral.

And so it comes as no surprise that the lien on the Treasury bonds proposed by River East would not be equivalent to LNV's retaining its lien on the building. Suppose the building turns out to be worth $40 million five years from now, yet River East, having borrowed heavily in the interim to finance improvements that bring the building's value up to that level, defaults. With its lien intact and the bankruptcy court unlikely in this second round of bankruptcy to stay foreclosure, LNV would be able to foreclose, and so would be paid in full. In contrast, if its lien were transferred to the substituted collateral, it would have to wait another 25 years to recover the $38.3 million owed it. Over that long period there almost certainly would be some inflation, so that in real terms the substituted collateral would turn out to be worth less.

Suppose, moreover, that during that period interest rates on 30-year Treasury bonds rose because of the nation's deteriorating fiscal position, or because of actual or expected inflation. The price of a fixed-income security is inverse to prevailing interest rates. With the interest rate on Treasury bonds 3 percent when River East proposed their substitution for the building as LNV's collateral, a $1000 bond would yield $30 in interest every year until the bond matured. Suppose interest rates doubled and as a result newly issued $1000 Treasury bonds carried a 6 percent interest rate and so yielded $60 in annual interest. Then no one

holding a 3 percent bond would be able to sell it for $1000. The price would not fall all the way to $500 (the level at which a $30 annual interest payment in perpetuity, as on a British consol, would constitute a 6 percent return on the buyer's investment), because the principal would be repaid when the bond matured, and so the price would creep upward as that date approached and knowing this current buyers would pay more than $500. But the bondholder may have a less valuable asset than the building owner if maturity is far in the future and interest rates rise in the meantime; and in that case a lien on the bond would be less valuable than a lien on the building, especially since the market value of the building might be growing while that of the bond was shrinking.

Assessments of risk differ, moreover, and there are multiple sources of risk. Treasury bonds carry little default risk (though more since the financial crisis of 2008 and the ensuing surge in the nation's sovereign debt), but long-term Treasury bonds carry a substantial inflation risk, which might or might not be fully impounded in the current interest rate on the bonds.

The substituted collateral might, it is true, turn out to be more valuable than the building and thus provide LNV with more security. But because of the different risk profiles of the two forms of collateral, they are not equivalents, and there is no reason why the choice between them should be made for the creditor by the debtor. Since LNV is undersecured, we have trouble imagining what purpose could be served by substituting collateral

other than to reduce the likelihood that LNV will ever collect its mortgage debt in full. A striking omission from River East's brief is a description of the subsection (iii) plan itself, beyond a statement that River East hopes to attract $40 to $50 million in loans or equity investment to refurbish the building. Were that feasible River East should have been able to strike a deal with LNV. River East's aim may have been to cash out LNV's lien in a period of economic depression and reap the future appreciation in the building's value when the economy rebounds. Such a cashout is not the indubitable equivalent of a lien on the real estate, and to require it would be inconsistent with section 1111(b) of the Code, which allows the secured creditor to defeat such a tactic by writing up his secured claim to the full amount of the debt, at the price of giving up his unsecured claim to the difference between the current value of the debt and of the security.

It's true that a secured claim is altered by a subsection (i) cramdown because the debtor is allowed to stretch out the payments due the creditor. But at least the creditor retains his collateral. That is the quid for the quo of giving up the right to immediate payment. By proposing to substitute collateral with a different risk profile, in addition to stretching out loan payments, River East was in effect proposing a defective subsection (i) cramdown by way of subsection (iii).

Even a valid subsection (i) cramdown may be hard on the secured creditor—his retention of the lien may be a poor substitute for immediate payment, or payment on

the schedule set forth in the original loan agreement, since he could, in principle anyway, have bypassed bankruptcy, thus retaining his lien without having to make any concessions to his debtor. Had River East proposed a subsection (i) plan (it did eventually—but that was too late, as we're about to see), it would have owed LNV $38.3 million, but that sum of money, paid over 30 years, has a present value of only $13.5 million at a 3 percent interest rate. It is easy to see why the creditor might prefer the original, tougher payment schedule, which might precipitate a default, enabling the creditor to foreclose at a time when the lien was worth a lot more, and thus his recovery would be greater, and earlier, than if he had to wait 30 years. True, if he foreclosed immediately, he might get just the depressed value of the building—but not if he were the high bidder at the foreclosure sale, for then he would get the building itself. It is also true that if the debtor doesn't default again, the creditor will have to wait for repayment in accordance with the repayment schedule in the original loan agreement.

So subsection (i) is friendly to debtors; River East wanted to make it friendlier still by squeezing a modified form of a subsection (i) cramdown into subsection (iii). As an aside, we point out that bankruptcy provisions "friendly to debtors" are so only in the short run; in the long run, the fewer rights that creditors have in the event of default, the higher interest rates will be to compensate creditors for the increased risk of loss.

After its subsection (iii) plan was rejected, River East submitted a third proposed plan, which was—at

last—for a genuine subsection (i) cramdown. LNV would retain its lien on the building, and the $13.5 million in 30-year Treasury bonds would guarantee payment in full of LNV's mortgage over 30 years. But the bankruptcy judge had lost patience. He refused to consider the third proposed plan, lifted the automatic stay, and dismissed the Chapter 11 proceeding. In doing these things he did not abuse his discretion—the applicable standard of appellate review. *Colon v. Option One Mortgage Corp.*, 319 F.3d 912, 916 (7th Cir. 2003); *In re Williams*, *supra*, 144 F.3d at 546. The third proposal left the Chapter 11 proceeding still far from completion, because there was bound to be a wrangle over the current value of the building and the proper interest rate. With River East having compromised its credibility by submitting two plans that sought to circumvent the statute, and the 90-day deadline having expired long ago (the Chapter 11 petition was filed on February 10, 2011, and the third proposed plan on August 23—194 days later), and LNV having waited years to enforce its lien, the bankruptcy judge was not required to stretch out the Chapter 11 proceeding any longer. We therefore affirm his decision and vacate the stay that we granted pending appeal.

AFFIRMED.