[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11590
_____

D.C. Docket Nos. 3:12-cv-00511-MW-EMT; 11-bkc-31637-WSS

In Re:  SEASIDE ENGINEERING & SURVEYING, INC.,

Debtor.
_____

SE PROPERTY HOLDINGS, LLC,

Claimant-Appellant,

versus

SEASIDE ENGINEERING & SURVEYING, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(March 12, 2015)

Before MARTIN and ANDERSON, Circuit Judges, and COTE,* District Judge.

_____

*Honorable Denise Cote, United States District Judge for the Southern District of New York,
sitting by designation.

ANDERSON, Circuit Judge:

SE Property Holdings, LLC, and affiliated entity Vision-Park Properties, LLC, (collectively "Vision") appeal the district court's order upholding decisions in the bankruptcy restructuring proceedings of Seaside Engineering and Surveying, LLC ("Seaside" or "Debtor"). After careful review of the record, and with the benefit of oral argument, we affirm. In doing so, we provide guidance to the Circuit's bankruptcy courts with respect to a significant issue: i.e., the authority of bankruptcy courts to issue non-consensual, non-debtor releases or bar orders, and the circumstances under which such bar orders might be appropriate.

## I. BACKGROUND

Seaside is a civil engineering and surveying firm that conducts forms of technical mapping. Seaside provided services to, among other clients, the U.S. Army Corps of Engineers. Seaside's principal shareholders prior to all bankruptcy litigation were John Gustin, James Mainor, Ross Binkley, James Barton, and Timothy Spears. The principals branched out from their work as engineers and entered the real estate development business, forming Inlet Heights, LLC, and Costa Carina, LLC. These wholly separate entities borrowed money from Vision with personal guaranties from the principals. Inlet Heights and Costa Carina defaulted on the loans, and Vision filed suit to recover amounts under the guaranties.

2

Gustin filed for Chapter 7 bankruptcy protection for himself. Mainor and Binkley followed suit. All were appointed Chapter 7 trustees. Gustin, Mainor, and Binkley listed their Seaside stock as non-exempt personal property in their required filings. In April 2011, the Chapter 7 trustee in the Gustin case conducted an action to sell Gustin's shares of Seaside stock. Gustin bid $95,500.00, and Vision defeated the bid with a purchase price of $100,000.00. Seaside attempted to block sale of Gustin's stock to Vision, but the bankruptcy court confirmed the sale. Following the sale of Gustin's stock, Seaside filed for Chapter 11 bankruptcy protection on October 7, 2011.[1]

Seaside proposed to reorganize and continue operations as the entity Gulf Atlantic, LLC ("Gulf"), an entity managed by Gustin, Mainor, Binkley, and Bowden, and owned by four members, the respective irrevocable family trust of each manager. The outside equity holders would receive promissory notes with interest accruing at a rate of 4.25% in exchange for their interest in Seaside and thus be excluded from ownership in Gulf. The bankruptcy court approved the Second Amended Plan of Reorganization ("Second Amended Plan" or "Reorganization Plan"), over objection of Vision, valuing Seaside at $200,000.00. The district court affirmed the bankruptcy court.

---

[1]    It is worth emphasizing here that Vision was never an unsecured creditor as to Seaside. Vision was an unsecured creditor as to Inlet Heights, LLC, and Costa Carina, LLC. Vision was only an equity holder in Seaside.

3

## II.  DISCUSSION

Vision raises myriad issues on appeal.  The arguments all essentially reduce to Vision's objections to the bankruptcy court's valuation and to the composition of the reorganized entity under the Second Amended Plan of Reorganization.  We address each argument in turn.

A. Valuation of Seaside

Vision argues that the bankruptcy court improperly valued Seaside under a forced-sale analysis as opposed to a going-concern analysis.  Vision continues that even under a forced-sale analysis, the bankruptcy court selected an inadequate discount rate by considering impermissible factors—particularly the risk of critical employees leaving the firm—and inadmissible expert testimony.  The valuation of Seaside is a mixed question of law and fact.  In re Ebbler Furniture & Appliances, Inc., 804 F.2d 87, 89 (7th Cir. 1986).  Selection of a valuation method is a legal matter subject to de novo review, and findings made under that standard are facts subject to clear error review.  Id.

We disagree with Vision that the bankruptcy court valued Seaside using a forced-sale method.  To begin, the bankruptcy court explicitly stated that "the correct method of valuation of the [D]ebtor is that as a going concern."  The bankruptcy court also considered future losses, which are necessary to a discounted cash flow analysis, the core of a going-concern valuation.  Most telling, the

4

bankruptcy court discussed and selected a discount rate, the critical input to calculate the present value of a business based on a cash flow.

Having established use of the proper valuation method, the bankruptcy court committed no error in considering the risk of losing key employees in selecting a discount rate. "[A]ll relevant factors to property value must be considered to arrive at a just valuation of a property." In re Webb MTN, LLC, 420 B.R. 418, 435 (Bankr. E.D. Tenn. 2009). Seaside's civil engineering and mapping operations rely upon human expertise, and its client base relies upon established relationships. The loss of key employees could equate to a complete deterioration of Seaside's value. Employee retention is certainly a relevant risk if not the key risk in calculating the discount rate in a case like this. The bankruptcy court also has discretion to weigh expert testimony and select portions to accept or reject. Id. Vision's argument is that the bankruptcy court did just this, and therefore the argument is unavailing. To reiterate, the bankruptcy court committed no error in valuing Seaside.

B. The Non-debtor Release or Bar Order[2]

As part of the Reorganization Plan, the bankruptcy court approved releases of claims against non-debtors:

---

[2]    Previous decisions of this Circuit have referred to non-debtor releases as "bar orders." E.g. In re Munford, 97 F.3d 449 (11th Cir. 1996). The terms are used interchangeably in this opinion.

5

> [N]one of the Debtor, . . . Reorganized Debtor, Gulf Atlantic . . . (and any officer or directors or members of the aforementioned [entities]) and any of their respective Representatives (the "Releasees") shall have or incur any liability to any Holder of a Claim against or Interest in Debtor, or any other party-in-interest … for any act, omission, transaction or other occurrence in connection with, relating to, or arising out of the Chapter 11 Case, the pursuit of confirmation of the Amended Plan as modified by the Technical Amendment, or the consummation of the Amended Plan as modified by this Technical Amendment, except and solely to the extent such liability is based on fraud, gross negligence or willful misconduct.

Reorganization Plan Art. IX.C. The district court upheld the propriety of these non-debtor releases. Although this Circuit has considered the propriety of such a release by a bankruptcy court, it has not done so recently. The issue warrants significant discussion.

1. History of Non-Debtor Releases in the Eleventh Circuit

This Circuit has spoken at least once on the validity of non-debtor releases in bankruptcy restructuring plans. We approved a release of claims against a non-debtor in In re Munford, 97 F.3d 449 (11th Cir. 1996). There, the debtor sued several defendants alleging breach of fiduciary duties related to a leveraged buy out. Id. at 452. One defendant offered to settle the claims but denied liability and conditioned its offer of settlement on issuance by the bankruptcy court of a protective order enjoining the non-settling defendants from pursuing contribution or indemnity claims against the settling defendant. Id. In order to make the settlement possible and to fund the bankruptcy estate, the bankruptcy court issued a

6

protective order barring the non-settling defendants from seeking contribution or indemnification from the settling defendant.  Id.  We held that 11 U.S.C. §105(a)[3] gives bankruptcy courts authority to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code, including the bar order in that case.   We upheld the non-debtor release because the settling defendant "would not have entered into the settlement agreement" without the bar order and because the bar order was "integral to settlement in an adversary proceeding."  Munford, 97 F.3d at 455.

Munford is the controlling case here, indicating that this Circuit permits non-debtor releases at least under some circumstances.[4]  However, the facts of this case

---

[3]    "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  11 U.S.C. § 105(a).

[4]    Munford thus places this Circuit within the majority view discussed below.  Although the Fifth Circuit in In re Vitro S.A.B. DE CV, 701 F.3d 1031, 1061 (2012), cited the Eleventh Circuit case of In re Jet Florida Systems, Inc., 883 F.2d 970 (1989), as being consistent with the minority view that non-consensual, non-debtor releases were prohibited by 11 U.S.C. §524(e), the Fifth Circuit citation was misplaced.  Our Jet Florida case did not involve a non-debtor release.  Rather, it involved the usual injunction against actions against the debtor itself.  The case involved a suit by a tort claimant against a debtor, after the discharge of the debtor, seeking to establish the liability of the debtor for the tort in order to obtain recovery against the debtor's insurer.  We held that the injunction pursuant to 11 U.S.C. §524(a) arising from the discharge of the debtor applied only with respect to the personal liability of the debtor.   Id. at 973.  In so holding, we quoted from Collier as follows:

> The provisions of 524(a) apply only with respect to the personal liability of the debtor.   When it is necessary to commence or continue a suit against a debtor in order, for example, to establish liability of another, perhaps a surety, such suit would not be barred.   Section 524(e) was intended for the benefit of the debtor

7

differ from those considered in <u>Munford.</u>  Instead of the settlement context in

<u>Munford</u>, here the releases prevent claims against non-debtors that would

undermine the operations of, and doom the possibility of success for, the

reorganized entity, Gulf.  Other Circuits have addressed substantively similar

releases, which we now consider.

2. Non-debtor Releases in Sister Circuits

Other circuits are split as to whether a bankruptcy court has the authority to

issue a non-debtor release and enjoin a non-consenting party who has participated

fully in the bankruptcy proceedings but who has objected to the non-debtor release

barring it from making claims against the non-debtor that would undermine the

operations of the reorganized entity.  <u>Collier Bankruptcy Practice Guide</u>[5] reports

the circuit split as follows.  The authors indicate, as the minority view, that the

---

but was not meant to affect the liability of third parties or <u>to prevent establishing
such liability</u> through whatever means required.

<u>Id.</u> at 973 (quoting 3 R. Babitt, A. Herzog, R. Mabey, H. Novikof, & M. Shinfeld, <u>Collier on
Bankruptcy</u>, ¶524.01 at 524-16 (15th ed. 1987) (emphasis added in Eleventh Circuit opinion)).
<u>Jet Florida</u> held that the tort claimant could proceed with suit against the debtor to establish the
fact of liability for purposes of the insurance coverage; and that, as a practical matter, the insurer
would be required to defend because the debtor, protected from personal liability, would be free
to default.  <u>Jet Florida</u>, 883 F.2d at 976.  Thus, nothing in <u>Jet Florida</u> addresses the issue before
us – i.e., the authority of bankruptcy courts to issue a non-consensual, non-debtor release.  And,
contrary to the citation of the Fifth Circuit, nothing in <u>Jet Florida</u> suggests that the Eleventh
Circuit is aligned with the minority view discussed below.

[5]    5-84 <u>Collier Bankruptcy Practice Guide</u> ¶ 84.02[1][c][v] (Alan N. Resnick & Henry J.
Sommer eds., 2014).

Ninth and Tenth Circuits prohibit such bar orders.[6]  Our research reveals that the

Fifth Circuit is also in the minority with respect to this issue.  In <u>In re Vitro S.A.V.</u>

<u>DE CV</u>, 701 F.3d 1031, 1061 (2012), the Fifth Circuit interpreted its prior

precedent, saying that it "seem[s] broadly to foreclose non-consensual non-debtor

releases in permanent injunctions."  The opinions for these minority circuits base

their conclusion on 11 U.S.C. §524(e), which provides in relevant part:

"[D]ischarge of a debt of the debtor does not affect the liability of any other entity

on, or the property of any other entity for, such debt."  <u>Collier</u> cites the majority of

the circuits as holding that such releases/injunctions are permissible, under certain

circumstances, reporting the Second, Third, Fourth, Sixth, and Seventh Circuits as

---

6    With respect to the Ninth Circuit, <u>Collier</u> cites <u>In re Lowenschuss,</u> 67 F.3d 1394, 1401-02 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1243 (1996), and <u>In re American Hardwoods, Inc.</u>, 885 F.2d 621, 625-26 (9th Cir. 1989).  With respect to the Tenth Circuit, <u>Collier</u> cites <u>In re Western Real Estate Fund, Inc.</u>, 922 F.2d 592, 601 (10th Cir. 1990).

so holding,[7] and the First, Eleventh, and D.C. Circuits as indicating that they agree

with the "pro-release" circuits.[8]

    3.  Eleventh Circuit Law is Consistent with the Majority View

As indicated in Part II.B.1 above, we believe that our Munford case places

this Circuit within the majority rule on this issue.  As noted above, in Munford, we

held that §105(a) provided authority for the bankruptcy court to enter the bar order

in that case, where the settling defendant provided funds for the bankruptcy estate,

but would not have entered into the settlement in the absence of such bar order,

and where the bankruptcy court found that the bar order was fair and equitable.  In

particular, we respectfully disagree with the position of the minority circuits with

respect to §524(e).  As noted, that section, in relevant part, provides that the

"discharge of a debt of the debtor does not affect the liability of another entity on

… such debt."  We agree with the Seventh Circuit in Airadigm:  "The natural

---

[7]    Collier cites as support for this proposition:  In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992); In re Continental Airlines, 203 F.3d 203, 214 (3d Cir. 2000); In re A.H. Robbins Co., Inc., 880 F.2d 694, 700-02 (4th Cir. 1989); In re Dow Corning Corp., 280 F.3d 648, 658 (6th Cir. 2002); In re Specialty Equip. Cos., 3 F.3d 1043, 1047 (7th Cir. 1993).  Our research reveals that the Third Circuit in Continental Airlines expressly declined to decide whether or not there ought to be a blanket rule prohibiting all non-consensual releases and permanent injunctions of non-debtor obligations.  Rather, the Third Circuit assumed the most flexible standard for testing the validity of such non-debtor releases, and held that the findings of fact below did not support such a bar order under that standard.  203 F.3d at 213-18.  Our research also reveals that the Seventh Circuit case, In re Airadigm Communications, Inc., 519 F.3d 640, 655-58 (7th Cir. 2008), more squarely supports the majority position than does the case cited by Collier.

[8]    For this proposition, Collier cites In re Munford, Inc., 97 F.3d 449 (11th Cir. 1996); In re Monarch Life Ins. Co., 65 F.3d 973, 984-85 (1st Cir. 1995); and In re AOV Industries, 792 F.2d 1140, 1152 (D.C. Cir. 1986).

reading of this provision does not foreclose a third-party release from a creditor's claims." 519 F.3d 640, 656 (2008). Pursuant to §524(e), the discharge of the debtor's debt does not itself affect the liability of a third party, but §524(e) says nothing about the authority of the bankruptcy court to release a non-debtor from a creditor's claims. As the Airadigm court noted, if Congress had meant to limit the powers of bankruptcy courts, it would have done so clearly, as it did in other instances, or it would have done so by creating requirements for plan confirmation as in 11 U.S.C. §1129(a) ("The court shall confirm a plan only if the following requirements are met ….").

Consistent with the majority view, we agree that §105(a) codifies the established law that a bankruptcy court "applies the principles and rules of equity jurisprudence." Airadigm, 519 F.3d at 659 (quoting Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244 (1939)). We also agree, however, with the majority view that such bar orders ought not to be issued lightly, and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances. The inquiry is fact intensive in the extreme.

Like the Fourth Circuit in Behrmann v. National Heritage Foundation, 663 F.3d 704, 712 (2011), we commend for the consideration of bankruptcy courts the factors set forth by the Sixth Circuit in Dow Corning Corp., 280 F.3d at 658.

11

There, the Sixth Circuit established a seven-factor test to guide bankruptcy courts, as follows:

> [W]hen the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor: (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

Id.  Again, we agree with the Fourth Circuit in Behrmann that bankruptcy courts should have discretion to determine which of the Dow Corning factors will be relevant in each case.  663 F.3d at 712.  The factors should be considered a non-exclusive list of considerations, and should be applied flexibly, always keeping in mind that such bar orders should be used "cautiously and infrequently," id. at 712, and only where essential, fair, and equitable.   Munford, 97 F.3d at 455.

Having set forth the foregoing standard, we turn next to review the bankruptcy court's application of the Dow Corning factors.

4. Application of the Dow Corning Factors

Recognizing the existing split among the circuits as to whether a third-party

release is permissible for non-debtors, but then relying on decisions of other Florida bankruptcy courts, the bankruptcy court applied the Dow Corning factors in a manner consistent with this opinion. We review a bankruptcy court's approval of non-debtor releases for abuse of discretion. In re Munford, 97 F.3d 449, 456 (11th Cir. 1996). Vision argues that this release satisfies none of the Dow Corning factors. We disagree.

> a. Factor One: An identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate.

The bankruptcy court concluded that this factor favored Seaside and favored inclusion in the Reorganization Plan of the non-debtor release. The bankruptcy court concluded that Gulf would deplete its assets continuing to defend against the voluminous litigation. The releasees in this case include Gustin, Mainor, Binkley, Bowden, and other former principals of Seaside who will be the key employees of the reorganized entity, Gulf. The reorganized entity's business is completely dependent upon the skilled labor of the releasees, its professional surveyors and engineers, as was the former business of the Debtor. These releasees would also be defendants in any further litigation and, in the absence of the bar order, would expend their time in defense of litigation as opposed to focusing on their

professional duties for the reorganized entity.  Applying this first factor flexibly,[9] we agree with the bankruptcy court that this factor favors approving the non-debtor release.  Time equates to money for the engineers.  The principals' preoccupation with additional lawsuits will interrupt the labor-intensive surveying, leading to a deterioration of the estate as Gulf loses valuable relationship-based work contracts.

> b. Factor Two: The non-debtor has contributed substantial assets to the reorganization.

The bankruptcy court stated that "[n]one of the releases [sic] contributed any new value to the reorganized debtor other than the contribution of their labor."  As other findings of the bankruptcy court make clear, the contribution of their services to the reorganized entity is the very "life blood of the reorganized debtor."  Doc. 474-1 at 47-48 (emphasis in original).  We conclude that this factor too favors Seaside.

> c. Factor Three: The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor.

The bankruptcy court noted the close relationship between the first factor and this factor.  The bankruptcy court found that the bar order was absolutely essential.  It found:  "To say that this case has been highly litigious would be an

---

[9]    In Munford itself there was more identity as between the settling defendant and the non-settling defendants than between the settling defendant and the debtor.  However, the gist of factor one – i.e., in the absence of the bar order, there will be a depletion of the assets of the debtor – was present.  The same is true in this case.

14

understatement." Doc. 474-1 at 46. It found: "Without [the bar order] it would be doubtful that the engineers and surveyors would ever be able to perform their professional work, complete contracts and create receivables necessary for the life blood of the reorganized debtor." Id. at 47-48. The court also found that the time and efforts expended by Vision "would appear disproportionate to the value of Vision's equity interest." Id. at 48. We agree that, without the bar order, the litigation would likely continue, bleeding Gulf dry and dashing any hope for a successful reorganization. We conclude that this factor weighs heavily in favor of inclusion of the non-debtor release.

> d. Factor Four: The impacted class, or classes, has overwhelmingly voted to accept the plan.

The bankruptcy court noted that Vision did reject this plan, as did two of the bankruptcy trustees (for Mainor and Binkley). However, the bankruptcy court noted that all other classes of creditors, whether impaired or not, have unanimously accepted the Reorganization Plan. Significantly, the court found that the equity holders rejecting the Plan will be paid the full value of their interests under the Plan. We cannot conclude that this factor favors Vision.

> e. Factor Five: The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction.

The bankruptcy court again noted that Vision will be paid in full for its share of Seaside. This factor weighs heavily in favor of the releases.

15

f. Factor Six: The plan provides an opportunity for those claimants who choose not to settle to recover in full.

The bankruptcy court stated that this factor was inapplicable. We cannot conclude that the bankruptcy court abused its discretion in this regard. Other than its claims for payment for the full value of its equity interest in the Debtor—which of course is to be paid in full under the Plan—Vision's identification of any other claims is vague. To the extent we can identify such other claims that Vision may be asserting, we conclude that they were made by Vision in challenging the Reorganization Plan and were rejected.

g. Factor Seven: The bankruptcy court made a record of specific factual findings that support its conclusions.

The bankruptcy court made <u>thorough</u> factual findings in reaching its decision. Its findings are amply supported by the evidence. The bankruptcy court's extensive consideration of this case weighs heavily against any abuse of discretion.

5. Additional Considerations Pursuant to <u>Munford</u>

Whether or not the bankruptcy court had specifically in mind the "fair and equitable" requirement of <u>Munford</u>, 97 F.3d at 455, it went on to further discuss considerations relevant to such a finding. The bankruptcy court referred to this case as a "death struggle" and recognized the apparently disproportionate expenditure of time for what Vision claimed to be a company valued at

16

$960,000.00.  Also very telling of the fairness and equity of the releases is that the bankruptcy court required the Debtor to voluntarily cease litigation of its claims for sanctions against Vision.  This requirement prevented an asymmetrical benefit for Seaside from the Reorganization Plan.  Finally, the release itself is narrowly limited in scope to claims arising out of the Chapter 11 case[10] and does not include claims arising out of fraud, gross negligence, or willful misconduct.  See Airadigm, 519 F.3d at 657 (the Seventh Circuit viewed a very similar bar order as "narrow:  it applies only to claims 'arising out of or in connection with' the reorganization itself and does not include 'willful misconduct.' … This is not 'blanket immunity.'").

6. Summary

We conclude that the bankruptcy court did not abuse its discretion in approving the non-debtor releases.  The releases are fair and equitable, and wholly necessary to ensure that Gulf may continue to operate as an entity.  This case has been a death struggle, and the non-debtor releases are a valid tool to halt the fight.

C. Bad Faith

Vision argues that Seaside proposed the Reorganization Plan in bad faith in

---

[10]    Vision argues that an additional provision of the Second Amended Plan serves as a broad release.  "The treatment provided herein is in full satisfaction of all claims and interest such Holder has against the Debtor, the Reorganized Debtor, the Officers, Directors and Shareholders of the Debtor and the Members of the Reorganized Debtor."  Seaside concedes that this provision is to be considered no broader with respect to non-debtors than the Bar Order quoted in Part II.B above.

contravention of the good faith requirement of 11 U.S.C. § 1129(a)(3). Vision characterizes the plan as intended "for the sole and exclusive benefit of its insiders." In re Davis Heritage GP Holdings, LLC, 443 B.R. 448, 461 (Bankr. N.D. Fla. 2011).

The parties dispute the proper standard of review of the bad faith determination. Vision argues that the bankruptcy court refused to follow the law and allowed outside factors to influence its decision, so this is an issue of law to be reviewed de novo, citing In re Fielder, 799 F.2d 656, 657 (11th Cir. 1986). Seaside argues that this is an attempt to convert the standard of review and that controlling precedent requires this Court to use the clearly erroneous standard in reviewing the totality of the circumstances. When read in context, Fielder is clear. "This court as an appellate court gives deference to all findings of fact by the fact finder if based upon substantial evidence, but freely examines the applicable principles of law to see if they were properly applied and freely examines the evidence in support of any particular finding to see if it meets the test of substantiality." Id.

"While the Bankruptcy Code does not define the term, courts have interpreted 'good faith' as requiring that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." In re McCormick, 49 F.3d 1524, 1526 (11th Cir. 1995). Those purposes include preserving jobs in the community, allowing the business to continue to operate

18

instead of liquidation, and achieving a consensual resolution between debtors and creditors.  In re United Marine, Inc., 197 B.R. 942, 947 (Bankr. S.D. Fla. 1996). "Bad faith exists if there is no realistic possibility of reorganization and the debtor seeks merely to delay or frustrate efforts of secured creditors."  Id. (citing In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984)).

The Reorganization Plan benefits more than just the Seaside insiders. Seaside's non-shareholder employees will maintain their jobs; other creditors will receive compensation over time; and the Corps of Engineers will continue to receive engineering services.  The Plan falls well within the purposes of the Bankruptcy Code and is therefore proposed in good faith.  Simply because one creditor is dissatisfied is insufficient to show bad faith.  Furthermore, with Vision as a shareholder, Seaside risked losing its small-business status, which would have eliminated a vital credit line, thus completely dooming the company.  This consideration justifies Seaside's desire to reorganize Gulf without Vision as a shareholder.  See In re Texaco Inc., 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988) (concluding a plan that enables to bring current, and resume future payments on, obligations signals good faith).  The plan to remove Vision from control is not just some nefarious plot.  Moreover, the record indicates that the key employees of the business would not continue to serve – the very life blood of the business – if Vision had a substantial role in the reorganized entity.

D.  Fairness, Equity, and Discrimination in the Reorganization Plan

Relying upon both 11 U.S.C. §1123(a)(4) ("A plan shall – … (4) provide the same treatment for each claim or interest of a particular class") and 11 U.S.C. §1129(b)(1) (a provision commonly known as the "cram down" provision), Vision argues that the Plan of Reorganization was unfair and inequitable in that it discriminated against Vision as a stockholder of the Debtor, in comparison to other stockholders of the Debtor.  First, Vision argues that the Plan violated §1129(b)(2)(C)(i) (providing that each equity interest holder must receive the full value of its interest).  The gist of this argument is that the bankruptcy court undervalued the equity interests, and therefore Vision did not receive full value for its stock.  This argument merges with Vision's valuation objection, which we disposed of earlier in this opinion.

Vision also argues that the Plan was discriminatory in that other stockholders of the Debtor received stock in the reorganized entity, while it did not. The bankruptcy court held that Vision received full value for its stock interest, and therefore §1129(b)(2)(C)(i) was satisfied, and thus there was no discrimination.[11]  Thus, the bankruptcy court concluded that there was no unfair discrimination.  Especially in the unusual circumstances of the instant case, we

---

[11]     The bankruptcy court pointed to the obvious fact that §1129(b)(2)(C) can be satisfied in either of two alternative ways:  pursuant to (i) by paying the holder of the equity interest its full value, or by satisfaction of (ii) (the absolute priority rule).  The bankruptcy court held that, because §1129(b)(2)(C)(i) was satisfied, it need not address §1129(b)(2)(C)(ii).

agree.   Our research has uncovered no cases in which an objecting holder of an equity interest – who has been paid in full for the value of his interest – could prohibit a successful reorganization by insisting on becoming a stockholder in the reorganized entity.  In none of the cases cited by Vision was an objecting equity holder paid the full value of its equity interest under the provisions of the Reorganization Plan.

E.  Interest Rate on Promissory Notes Exchanged Pursuant to the Second Amended Restructuring Plan

Vision did not receive an immediate cash payment for its interest in Seaside; rather, Vision received promissory notes accruing with an interest rate of 4.25%. Vision argues that this rate does not adequately compensate for the highly prospective nature of the notes.  This Court reviews the adequacy of the interest rate for clear error.  In re Brice Rd. Devs., 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008).

The Supreme Court adopted the formula approach for determining the interest rate payable to creditors in bankruptcy proceedings.  Till v. SCS Credit Corp., 541 U.S. 465, 478-79, 124 S. Ct. 1951, 1961 (2004).  "Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate . . . .  Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly."  Id.  Here, the bankruptcy court applied this

21

formula, adding a 1% adjustment to the prime rate of 3.25%.  The 1% adjustment is within the range suggested by the Supreme Court in Till, 124 S. Ct. at 1962, and therefore the bankruptcy court committed no clear error.

F. Exams Pursuant to Bankruptcy Rule 2004

Vision contends that the bankruptcy court abused its discretion by allowing Seaside to take Bankruptcy Rule 2004 exams of Vision officers.  See In re Piper Aircraft Corp., 362 F.3d 736, 738 (11th Cir. 2014) (concluding that this Court reviews any discovery order for abuse of discretion).  This argument is wholly without merit.  The bankruptcy court has wide discretion with respect to such discovery matters.  A broad inquiry was necessary here to establish, for example, that Vision's policies may result in continued litigation, thus bolstering the case for the non-debtor releases.

G. Constitutionality of the Bankruptcy Decision

Vision's initial brief has wholly failed to articulate a constitutional claim of arguable merit.  Even if Vision had adequately asserted a takings claim, the extinguishing of a property interest through bankruptcy proceedings—even if the creditor receives nothing—does not constitute a taking.  In re Morel, 983 F.2d 104, 105 (8th Cir. 1992).

## III.  CONCLUSION

The bankruptcy court committed no reversible error by approving the

22

Second Amended Plan.

AFFIRMED.[12]

---

[12]    Seaside's Motion to Dismiss Appeal as Moot is DENIED.